Becker v. State






COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS





JAMES JOHNSON,

                                    Appellant,

v.

THE STATE OF TEXAS,

                                    Appellee. 

§
 
§
 
§
 
§
 
§

§


No. 08-05-00165-CR

Appeal from
41st District Court

of El Paso County, Texas

(TC # 20030D04174)



 

 


 




O P I N I O N

            James Johnson appeals his capital murder conviction. A jury found Appellant guilty and the
trial court sentenced him to an automatic life sentence as the State did not seek the death penalty. 
We affirm.
FACTUAL SUMMARY
            This is the story of the tragic life and death of Aayunn Johnson, who was born on February
19, 2003 to Appellant and Rosemary Gaines. The trio moved into an El Paso duplex at 8841-B
Lawson in May 2003. Leticia Brown, a friend, lived in a nearby apartment. Brown filled out the
application and signed the lease agreement for the duplex, and Appellant gave her the money to pay
the rent each month. The next door neighbor, Ryan Labarbera, recalled seeing Appellant at the
duplex on a daily basis. 
            Suzie Melendez lived in the apartment next door to Leticia Brown and her three sons. On
June 2, 2003, Melendez was cooking supper when she heard that two women were asking whether
anyone knew CPR. Melendez is certified to perform CPR and she went over to Brown’s apartment. 
Melendez saw Appellant holding a baby while the child’s mother was screaming and talking on the
telephone. Melendez approached Appellant, but he would not give the child to her until Brown told
him to do so. When Melendez determined that Aayunn was not breathing and did not have a
heartbeat, she began CPR. Aayunn responded briefly with a cough and a heartbeat, but it was not
sustained. Melendez continued performing CPR until the paramedics arrived. After Melendez was
relieved by the paramedics, she saw Appellant talking on his cell phone. Shortly thereafter,
Appellant left the apartment with Brown’s oldest son. Melendez did not see him again. 
            Michael Cloakey is an EMT with the El Paso Fire Department. He and two other firefighters
responded to the call and immediately began CPR on Aayunn. Although they did not get a response
and Aayunn appeared to be dead, they continued resuscitation efforts in the ambulance during the
transport to the hospital. Gaines rode in the ambulance with Aayunn. Cloakey noticed a type of skin
blotchiness known as “modeling” on the child’s back which is an indicator of shock when seen in
children. Gaines told the firefighters that the baby had fallen from a swing earlier that day and they
placed him in the crib. When they checked on him, he was not breathing. She also said that the
baby’s left arm was injured when her husband nearly dropped him and caught him by the arm. In
Cloakey’s opinion, Gaines’ explanations were inconsistent with the injuries he observed.
            Firefighter Gabriel Licerio responded to the call with Cloakey. Licerio immediately noticed
that the child had suffered trauma evidenced by deformity of the right shoulder and right leg,
generalized bruising over the entire body, bruising around the nose and mouth, and lacerations on
the arms. He also saw generalized bruising of the abdomen. 
            Police officer Baur also responded to the scene. When he arrived, the EMS ambulance was
in the parking lot and he met with EMS personnel to obtain information. He observed EMS
personnel performing CPR on an baby Aayunn. Baur also saw that baby Aayunn had sustained
trauma to his arms, legs, and abdomen. In Baur’s opinion, the injuries were suspicious because a
baby cannot self-inflict these injuries. Baur was present when the doctors examined the baby at the
hospital and pronounced him dead. Baur requested the presence of the county medical examiner. 
            Dr. Corrine Stern, the chief medical examiner for El Paso County, arrived at the hospital and
briefly examined Aayunn. She observed visible injuries to his body and determined that rigor mortis
was present even though his body was like a “rag doll” because of the numerous fractures of his
bones. The body was transported to the medical examiner’s office where Dr. Stern performed the
autopsy. Dr. Stern described Aayunn as a small child because at only 12 pounds and 21 inches in
length, he fell below the one-tenth percentile for an average infant of his age. Aayunn had a round
purple contusion on the left side of the forehead and another one across the bridge of his nose. 
Dr. Stern found bruising beneath the scalp which corresponded to the bruise on the forehead. 
Aayunn also had an abrasion on the tip of the nose, an irregular bruise on both sides of his nose and
cheeks, and a bruise on his chin. The bruising over the nose and cheeks is consistent with the
placement of a hand across his face. Dr. Stern found hemorrhaging in both inner ears. 
            When Dr. Stern examined Aayunn’s torso, she found multiple purple contusions on the right
quadrant of the abdomen. The internal examination revealed bruises on the musculature of the
posterior chest wall as well as the posterior of both lungs, with the worst bruising on the left lung. 
In her opinion, injuries to the lungs and overlying musculature were caused by blunt force trauma. 
Nearly all of Aayunn’s ribs on the left side were fractured posteriorly and several on the right were
fractured laterally. Although one rib had been previously fractured and had healed, all of the
remaining fractures were recent. Because there was fresh hemorrhage and the bones had not started
to heal, Dr. Stern estimated that the fractures had occurred only one or two days prior to death. 
Dr. Stern added that it is almost impossible to fracture an infant’s ribs and it can only occur with
extreme force. Posterior lateral rib fractures in babies usually result from extreme shaking or
squeezing, but they could occur if the infant is struck against a hard surface. Dr. Stern examined
Aayunn’s trachea and found hemorrhage of the muscles in the mid and distal portions. The internal
examination also revealed hemorrhage surrounding the entire length of Aayunn’s spine. Dr. Stern
believed that injury resulted from extreme shaking or blunt force trauma. 
            Dr. Stern next examined the baby’s extremities and found a bruise on the right upper arm that
extended all the way around the arm. He had multiple abrasions on the right arm and a laceration
on the left arm. He also had an abrasion on his right knee and a patterned contusion on the right
shin. Dr. Stern observed a reddish blue contusion on the inside of the left foot and a blue contusion
on the inside of the right foot. She also examined X-rays of Aayunn’s body which revealed recent
fractures of both shoulder blades, the left collar bone, the left femur, the left tibia, and left fibula. 
Dr. Stern found evidence that some of these recent fractures had also been fractured in the past and
had healed before being fractured again. Aayunn also had ten healing fractures: the humerus and
ulnas on both sides, the right femur, both tibias, and the right fibula. “Bucket handle” fractures were
found in the left tibia, left humerus, and right femur. These fractures are caused by holding an infant
by the wrist or foot and shaking him. In Dr. Stern’s opinion, Aayunn had probably suffered these
fractures from the time he was born until his death. She also offered her opinion that Aayunn died
from a combination of blunt force injuries to his extremities, head, and torso. 
            Detective Joe Ochoa and other members of the El Paso Police Department executed a search
warrant at the Lawson duplex. They found documents connecting Appellant to the residence,
including a sales receipt for a vehicle purchased by Appellant and Gaines, a traffic citation issued
to Appellant, and a sales receipt for stereo equipment. One bedroom contained baby clothes, a
bassinet, baby swing, and other items indicative of a baby’s room. In the second bedroom, Ochoa
found both men’s and women’s clothing. Ochoa opened a trash bag in the kitchen and found first
aid tape and gauze stained with blood. Ochoa also discovered that the residence had a surveillance
camera attached to a small TV in the living room. The camera was situated so that the front door
and entry to the patio could be watched. Ochoa attended the graveside services for baby Aayunn in
an effort to apprehend Appellant, but Appellant did not attend his son’s funeral.
            Monique Hannon attended the funeral services on June 11, 2003 and saw Appellant in the
passenger seat of a white Acura driving by the funeral home. Two women were in the Acura with
him. The vehicle did not stop and when it returned a short time later, Appellant was not in it. 
Hannon called the police to report that she had seen Appellant in the Acura and that he had changed
his appearance by shaving his head. Detective Robert Posada went to the funeral home after police
received the tip from Hannon and he obtained Rosa Thompson’s consent to search her white Acura. 
Posada searched the vehicle but did not find any evidence pertaining to the case.
            Nera Tapia, a friend of Appellant, saw Aayunn when he was first born and then later while
visiting at their apartment. Tapia was at the apartment when Aayunn was about two and one-half
months old. She saw a bruise on the baby’s left leg extending from the kneecap to the ankle. Tapia,
who had received training to be a surgical technician, also believed that the right upper thigh bone
was broken because the right hip and thigh did not align properly. Appellant entered the room and
demanded to know why Tapia was in the bedroom. Gaines told him that she had asked Tapia to
check the baby. Tapia told Appellant that Aayunn needed to go to the hospital and she even
volunteered to take him. Appellant said no and told Tapia to leave. In an effort to get him to take
the baby to the hospital, Tapia persisted and explained that it could be an infection or a spider bite. 
She did not believe that to be true, but she was trying to get him to take Aayunn to the hospital. 
When Tapia got home, Appellant called and apologized to her, saying that he understood she was
looking out for the baby. The next time she saw Appellant, Tapia asked whether he had taken
Aayunn to the hospital. Appellant told her he had, that Aayunn had an infection, and that the baby
would be in the hospital for a few days. Tapia saw Aayunn two weeks later and the child still had
the same injury to his leg. After Aayunn died, Appellant asked Tapia if she would take pictures of
Aayunn at the funeral because he could not attend. Tapia did so and Appellant went to her house
to look at them. Appellant arrived late at night with Tapia’s friend, Rosa Thompson, and they spent
the night.
            The following morning, June 29, 2003, police received a tip that Appellant was at Tapia’s
residence. Officers went to the house around 9 a.m. Initially, Tapia lied and told them Appellant
wasn’t there. After Tapia and Thompson left the residence, the officers heard something being
moved around, indicating someone else was present. One of the officers knew Appellant and
identified himself. Appellant replied that he would not give himself up or come out, but he wanted
to call a lawyer and the newspaper. Appellant remained in the home for about an hour before
surrendering. When the officers went inside to make sure no one else was in the house, they saw that
a dresser had been moved behind a bedroom door to prevent anyone from entering. 
            Rosemary Gaines testified for the State at trial. Gaines, who had originally been indicted for
the capital murder of Aayunn (Count I) and injury to a child by omission (Count II), had pled guilty
to Count II and was serving a life sentence. The State dismissed Count I in exchange for the guilty
plea. Gaines admitted that at the time of Aayunn’s death, she was on probation for injury to her
daughter. But she claimed that Appellant had actually committed the offense and she had pled guilty
to protect him. Appellant was the primary caretaker of Aayunn and he would not let her feed or
bathe him. She first noticed injuries to Aayunn when he was about six weeks old. Gaines saw that
Aayunn’s right leg was swollen and she asked Appellant about it. She accepted Appellant’s
explanation that it was probably due to the way Aayunn was sleeping. When Aayunn was about two
months old, Gaines saw bruising on his leg and asked Appellant about it. Appellant answered that
he might have gripped the baby’s leg too hard when changing a diaper. After that, Gaines continued
to see new bruises on Aayunn’s body but Appellant provided different excuses. Gaines did not take
Aayunn to the doctor because Appellant would not let her and she was afraid he would beat her. On
one occasion, Gaines asked Tapia to look at Aayunn’s leg. Tapia told Gaines that his leg might be
broken. Gaines still did not take Aayunn to the doctor because she was afraid. Appellant told her
that she would be accused of child abuse because of her previous conviction for injury to a child. 
On cross-examination, Gaines admitted that she struck Appellant on the head with a frying pan
during an argument about his affair with Rosa Thompson. Gaines subsequently wrote Appellant a
letter stating that she felt that the only reason he was staying with her was because of their son. 
            Gaines’ sister Gladys also testified for the State. Gladys lived with Appellant and Gaines in
an apartment for about a month after Aayunn was born. Gladys continued to visit them after they
moved to the duplex. Gladys examined photographs of the duplex taken by police and identified the
clothing in the closet as belonging to Appellant. Gladys explained that when Aayunn was first born,
Appellant acted like a kid with a brand new toy but as time passed, the toy got old. Gladys saw
Appellant yell at Aayunn when he was crying. On some occasions, Appellant would pick the child
up by his wrists. When asked to describe her last visit at the duplex, Gladys said that Gaines was
a “little crazy.” Gaines was washing Aayunn in the tub and Appellant was yelling at her because the
baby was crying. Gladys saw that Aayunn’s leg was injured.
            Four witnesses testified on Appellant’s behalf at the guilt-innocence phase. Daniel Villa, one
of Leticia Brown’s sons, met Appellant about a month after Aayunn was born. Appellant, Gaines,
and Aayunn were living in an apartment on Arlin Street. Daniel spent eight to ten hours every day
with them at this apartment. Daniel recalled that Gaines usually fed Aayunn and there was limited
contact between Appellant and the baby. Appellant admitted to Daniel that he was afraid he would
hurt Aayunn because he was so small. He never saw Appellant being physically aggressive toward
Aayunn. Gaines, on the other hand, was frustrated and acted as if caring for Aayunn was taking up
her time. Gaines and Aayunn moved to the duplex on Lawson in late April or early May but
Appellant moved to a different apartment on Arlin Street. Appellant kept a television, Playstation,
and XBox in this apartment but he did not have any clothes there. Daniel insisted that Appellant
lived in the apartment and to his knowledge, Appellant never slept at the duplex and had almost no
contact with Aayunn other than checking on him occasionally. Daniel continued to spend eight to
ten hours every day with Appellant. Once in a while, he would go with Appellant to check on
Aayunn at the duplex. Gaines would often be in her bedroom and Aayunn would be in another
room. Daniel saw an injury to Aayunn’s leg approximately one week before Gaines and the baby
moved to the duplex. He told both parents, but neither of them did anything about it. He never saw
any other injuries.
            On June 2, 2003, Appellant and Daniel spent the day together as usual. They went to the
duplex at about 6:30 p.m. to play video games. Daniel sat down and waited while Appellant went
in Aayunn’s room. Daniel’s brother, Fabian, was also at the duplex. Appellant called out to Gaines
and asked what was wrong with his son. Gaines became hysterical and said, “It’s always my fault. 
Why is everyone always blaming me?” Appellant came out of the room with his eyes bugged out
and asked Daniel to go call his mother. Daniel picked up a cell phone and walked outside but Gaines
ran by him with Aayunn in her arms. She carried the baby to Leticia Brown’s apartment and the
others followed. Gaines handed the child to Brown and said, “Help me.” Brown called 911 while
Daniel and Appellant attempted to give Aayunn CPR. Suzie Melendez came over and began
performing CPR. After the EMTs arrived, Daniel and Appellant left, but they did not leave together. 
On cross-examination, Daniel admitted that he gave two statements to the police because he falsely
stated in the first one that he was not present at the duplex on the day Aayunn died. His brother,
however, told the police that both of them were at the duplex. When Appellant was on the run after
Aayunn died, he called Daniel and asked for help. Daniel agreed to help him in any way that he
could. 
            Fifteen-year-old Fabian also testified. Fabian knew Appellant because he was a friend of
Fabian’s stepfather. Fabian visited Appellant on a daily basis at the apartment on Arlin Street. He
would go to the apartment after school to play video games. Like his brother, Fabian testified that
Appellant did not live at the Lawson duplex. Fabian saw Gaines with Aayunn on a daily basis and
he recalled that she would get moody when the baby cried. Fabian recalled seeing Appellant hold
Aayunn only twice, once at the Arlin apartment and once at the duplex. On both occasions,
Appellant placed Aayunn on his chest. Fabian was at the duplex with Appellant and Daniel on the
day Aayunn died. They walked into the duplex at around 8 p.m. and Appellant went into the
bedroom to check on the baby. He called out for Gaines and asked what was wrong with Aayunn,
but Gaines did not answer him. Appellant then came out of the bedroom and told Daniel to call his
mother. They all ran to her apartment and laid the baby on the floor. Daniel tried to give the baby
CPR, and then the neighbor took over until the ambulance arrived. Fabian had previously seen only
one injury on the child, a bruise on his arm. He denied telling the police that he had seen the child’s
arm when it was swollen and that Appellant went to buy medicine for it. 
            Leticia Brown testified that she lived at 8804 Lawson, Apartment 4 with her sons Daniel,
Fabian, and Ramon. Brown knew Gaines before she met Appellant, who is a friend of her husband. 
Brown first saw Aayunn when he was one or two weeks old. She saw the baby regularly when she
would babysit for him in her apartment. She generally kept the baby four days a week between the
time she got home from work until 9 or 10 in the evening. She last saw Aayunn some two weeks
before he died. On May 17, Brown was babysitting while Appellant and Gaines attended a concert. 
Aayunn’s left leg was bruised and he was crying to the point that Brown could not even change his
diaper. Aayunn also had a severe bruise on his left upper arm and an injury which was bandaged.
Concerned about the baby, Brown called Appellant on his cell phone around 4 or 5 p.m. and asked
them to come home. They did not immediately return. Instead, Gaines and her sister arrived close
to midnight. Brown told Gaines that she needed to take the baby to a doctor because he could not
move his leg and would not stop crying. Brown did not know whether Gaines took Aayunn to the
doctor because Gaines did not allow her to see him. On the day Aayunn died, Gaines ran up to
Brown and said the child was not breathing. They put him on the floor of her apartment and
Appellant attempted to perform CPR. Brown stopped him because he did not know how to do it. 
She then ran next door and asked her neighbor for help.
            Brown went to the jail and visited Gaines after she was arrested. She asked Gaines if she had
done this to the baby and she said, “No, I did not do it this time.” Gaines also told her that Appellant
had hurt the other child and she had covered for him. Gaines said that if she went down, she was
going to take Appellant with her. 
            Camille Jones spoke to Gaines while they were both in custody in the county jail. Jones had
known Appellant for two years because he is a friend of her brother and he had been to her
grandmother’s house with Aayunn. Gaines told Jones that she threw Aayunn against the wall
because she did not want him and should not have had him. She also said that if Appellant ever left
her, she would hurt the baby. In her opinion and based on her observations, Jones believed that
Appellant was a good father.
            The jury rejected Appellant’s defenses and found him guilty of capital murder as either the
primary actor or as a party with Gaines. Because the State did not seek the death penalty, the trial
court imposed an automatic life sentence. 
ACCOMPLICE WITNESS RULE
            In Issues One and Two, Appellant contends that the evidence is legally and factually
insufficient to corroborate the accomplice testimony of Rosemary Gaines as required by Article
38.14 of the Code of Criminal Procedure. He also complains that the trial court erred by failing to
submit an accomplice witness instruction. We will consider charge error first.
Charge Error
            In reviewing charge error, we employ a two-step analysis. First, we view the charge as a
whole to determine whether error actually exists. Almanza v. State, 686 S.W.2d 157, 171
(Tex.Crim.App. 1984). Our review is not limited to a series of isolated statements or portions of the
charge standing alone. Torres v. State, 116 S.W.3d 208, 211 (Tex.App.--El Paso 2003, no pet.). 
Second, we must determine whether sufficient harm resulted from the error so as to require reversal.
Almanza, 686 S.W.2d at 171; Washington v. State, 930 S.W.2d 695, 698 (Tex.App.--El Paso 1996,
no pet.). Which harm analysis applies depends upon whether the defendant objected. Abdnor v.
State, 871 S.W.2d 726, 731-32 (Tex.Crim.App. 1994); Torres, 116 S.W.3d at 211. If a timely
objection was lodged at trial, we will reverse if the defendant suffered some harm as a result of the
error. Almanza, 686 S.W.2d at 171. If the defendant failed to object, we will reverse only if the
defendant suffered egregious harm. Id. In order to assess the degree of harm, we examine the error
in light of the entire jury charge, the state of the evidence, including the contested issues and the
weight of the probative evidence, the arguments of counsel, and any other relevant information. Id.
            A defendant has a right to an instruction on any defensive issue raised by the evidence,
whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the
trial court may think about the credibility of the evidence. Granger v. State, 3 S.W.3d 36, 38
(Tex.Crim.App. 1999). Article 38.14 of the Code of Criminal of Procedure provides that “[a]
conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence
tending to connect the defendant with the offense committed; and the corroboration is not sufficient
if it merely shows the commission of the offense.” Tex.Code Crim.Proc.Ann. art. 38.14 (Vernon
2005). The purpose of this rule is to assure that the jury does not consider the accomplice witness’s
testimony unless it finds that the accomplice witness is telling the truth and that other evidence
corroborates the discredited witness’s testimony. See McDuff v. State, 943 S.W.2d 517, 520
(Tex.App.--Austin 1997, pet. ref’d). 
            A witness may be an accomplice either as a matter of law or as a matter of fact; the evidence
determines what jury instruction, if any, needs to be given. Cocke v. State, 201 S.W.3d 744, 747
(Tex.Crim.App. 2006). If a witness is an accomplice as a matter of law, the trial court is required
to provide an accomplice-witness instruction to the jury. Id. at 748. If the parties present conflicting
or unclear evidence as to whether a witness is an accomplice, the jury must first determine whether
the witness is an accomplice as a matter of fact. Id. The trial court is not required to give the jury
an accomplice-witness instruction when the evidence is clear that the witness is neither an
accomplice as a matter of law nor as a matter of fact. Id.
            Appellant asserts that Gaines was an accomplice witness as a matter of law because she was
indicted for the same offense and she pled guilty. He also points to the parties instruction in the
charge which told the jury it could find Appellant guilty whether he acted alone or whether he acted
together with Gaines. The State responds that Gaines is not an accomplice as a matter of law
because the capital murder charge against her was dismissed and she pled guilty to a different
offense--injury to a child by omission--which is not a lesser-included offense of capital murder. The
State adds that Gaines is not an accomplice witness as a matter of law because she is not a
blameworthy participant in the capital murder of her son.
            Article 38.14 does not define “accomplice witness” but a definition has been developed
through appellate decisions. An accomplice is an individual who participates with a defendant
before, during, or after the commission of the crimes and acts with the requisite culpable mental
state. Cocke, 201 S.W.3d at 748. Participation requires an affirmative act or omission that promotes
the commission of the offense with which the defendant is charged. Id. An individual is clearly an
accomplice if she, like the defendant, could be prosecuted for the offense or a lesser offense. Id.;
Blake v. State, 971 S.W.2d 451, 455 (Tex.Crim.App. 1998). There must exist evidence sufficient
to connect the alleged accomplice to the criminal offense as a “blameworthy participant,” but
whether the alleged accomplice witness is actually charged or prosecuted is irrelevant. Cocke, 201
S.W.3d at 748; Blake, 971 S.W.2d at 455. Mere presence at a crime scene does not make an
individual an accomplice, nor is an individual an accomplice merely because she has knowledge
about a crime and fails to disclose that knowledge. Cocke, 201 S.W.3d at 748; Blake, 971 S.W.2d
at 454.
            The State prosecuted this capital murder case based on two theories: (1) Gaines was the
primary actor and Appellant participated as a party; and (2) Appellant acted alone. Appellant does
not argue that Gaines is an accomplice under the State’s first theory and the State’s brief is similarly
restricted. Consequently, we have restricted our review to the precise issue raised by Appellant.
            A person who is merely present at the scene of a crime or who has knowledge of a crime and
fails to disclose it is not considered an accomplice. In other words, failure to act usually does not
render a person an accomplice because a person typically does not have a duty to act in those
circumstances. See Tex.Penal Code Ann. § 6.01(a)(Vernon 2003)(“A person commits an offense
only if he voluntarily engages in conduct, including an act, an omission, or possession.”); Tex.Penal
Code Ann. § 6.01(c)(Vernon 2003)(“A person who omits to perform an act does not commit an
offense unless a law as defined by Section 1.07 provides that the omission is an offense or otherwise
provides that he has a duty to perform the act.”). But a parent has a statutorily imposed duty to
provide care and protection for a child. See Tex.Fam.Code Ann. § 151.001(a)(2)(Vernon Supp.
2006). Neglect of this duty which results in serious bodily injury to the child subjects the parent to
prosecution for injury to a child. Tex.Penal Code Ann. §§ 22.04(a)(1), (b)(1)(Vernon Supp. 2006). 
Gaines pled guilty to intentionally and knowingly causing serious bodily injury to her son by failing
to perform her duty to provide care, protection, and control. While Gaines did not plead guilty to
her son’s capital murder and injury to a child is not a lesser-included offense of capital murder, we
conclude that Gaines promoted the capital murder through her failure to protect Aayunn from the
repeated vicious assaults committed by Appellant. Stated differently, she is a blameworthy
participant in the commission of this offense, and she is thus an accomplice as a matter of law. The
trial court erred by failing to give an accomplice witness instruction.
            We turn now to the harm analysis. Because Appellant did not object at trial, we must
determine whether he suffered egregious harm from the absence of this instruction. Under the
egregious harm standard, the omission of an accomplice witness instruction is generally harmless
unless the corroborating (non-accomplice) evidence is so unconvincing in fact as to render the
State’s overall case for conviction clearly and significantly less persuasive. Herron v. State, 86
S.W.3d 621, 632 (Tex.Crim.App. 2002). In determining the strength of a particular item of
non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its
tendency to connect the defendant to the crime. Id.
            Gladys Gaines is the only witness who saw Appellant act in an angry manner towards
Aayunn. While living with the family, Gladys observed Appellant yelling at Aayunn when he was
crying. She also saw Appellant pick up Aayunn by his wrists and hold him in that fashion while
yelling at him. Dr. Stern found that Aayunn had unique bone fractures of his arm and leg which are
caused by holding an infant by an unsupported limb and shaking the child. On another occasion,
Gladys saw Appellant yelling at Gaines because Aayunn, who had an obvious injury to his leg,
would not stop crying. Appellant became angry when Gaines asked Tapia, a friend with some
medical training, to examine Aayunn’s apparently broken leg. He demanded that Tapia leave when
she recommended that Aayunn be taken to the hospital immediately and he would not allow Tapia
to take the child to the hospital. When Tapia later asked him if he had taken Aayunn to the doctor,
he lied. On the day of the concert, Appellant left the child at Leticia Brown’s home. Although
Brown called and asked him to come home because Aayunn would not stop crying, he didn’t return. 
Instead, it was Gaines who picked up the baby some eight hours later. Thereafter, despite the fact
that Brown had been babysitting Aayunn four days a week, Appellant no longer brought him to her
home. She did not even see the child again until the day he died. Finally, Appellant fled when the
firefighters arrived to treat Aayunn; he did not go to the hospital and he did not attend the funeral. 
He remained in hiding for twenty-seven days and when police finally found him, he barricaded
himself inside a home and initially refused to surrender.
            The testimony of Glady Gaines, Nera Tapia, and Leticia Brown was not directly contradicted,
nor was it shown to be weak and unconvincing. While Gladys is the accomplice’s sister, there is
nothing to indicate that she had anything to gain by lying about Appellant’s conduct toward Aayunn,
particularly since her sister had already pled guilty by the time of trial. Both Tapia and Brown were
friends of Appellant. Appellant’s flight and his failure to attend his son’s funeral shows a
consciousness of guilt and it is a circumstance from which an inference of guilt may be drawn. 
Bigby v. State, 892 S.W.2d 864, 884 (Tex.Crim.App. 1994); Valdez v. State, 623 S.W.2d 317, 321
(Tex.Crim.App. 1979). Consciousness of guilt may be one of the strongest indicators of guilt. Lee
v. State, 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref’d); Torres v. State, 794 S.W.2d
596, 598 (Tex.App.--Austin 1990, no pet.). The corroborating evidence is not so unconvincing to
suggest that Appellant suffered an unfair trial due to the absence of the accomplice witness
instruction. We thus conclude that the trial court’s failure to submit an accomplice witness
instruction did not cause Appellant egregious harm.
Sufficiency of the Corroborating Evidence
            Appellant next argues that the evidence is legally and factually insufficient to corroborate
Gaines’ testimony. We measure sufficiency of the evidence against the hypothetically correct jury
charge. See Gollihar v. State, 46 S.W.3d 243, 253 (Tex.Crim.App. 2001); Malik v. State, 953
S.W.2d 234, 240 (Tex.Crim.App. 1997). Such a charge would have instructed the jury that Gaines
was an accomplice witness. But we do not review the corroborating evidence under the traditional
legal and factual sufficiency standards because the accomplice-witness rule is not based upon federal
or state constitutional notions of sufficiency. Solomon v. State, 49 S.W.3d 356, 361 (Tex.Crim.App.
2001); Cathey v. State, 992 S.W.2d 460, 462-63 (Tex.Crim.App. 1999). Instead, we must eliminate
Gaines’ testimony from consideration and then examine the remaining portions of the record to see
if there is any evidence that tends to connect Appellant with the commission of the crime. Solomon,
49 S.W.3d at 361. “Tendency to connect” rather than rational sufficiency is the standard: the
corroborating evidence need not be sufficient by itself to establish guilt. Id. 
            No precise rule can be formulated regarding the amount of evidence required to corroborate
the testimony of an accomplice witness. Dowthitt v. State, 931 S.W.2d 244, 249 (Tex.Crim.App.
1996); Gill v. State, 873 S.W.2d 45, 48 (Tex.Crim.App. 1994). The non-accomplice evidence does
not need to be sufficient in itself to establish guilt beyond a reasonable doubt. Dowthitt, 931 S.W.2d
at 249; Gill, 873 S.W.2d at 48. Nor must the non-accomplice evidence directly link the accused to
the commission of the offense. Dowthitt, 931 S.W.2d at 249; Gill, 873 S.W.2d at 48. Even
apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of
corroboration. Dowthitt, 931 S.W.2d at 249.
            We have already detailed the non-accomplice witness evidence in our review of charge error. 
That evidence includes the testimony of Gladys Gaines, Dr. Stern, Nera Tapia, and Leticia Brown. 
It also includes Appellant’s flight from the scene, his extended absence following Aayunn’s death,
and his conduct in barricading himself in a residence and refusing to exit when police commanded
him to do so. We conclude that the non-accomplice witness evidence sufficiently corroborates the
accomplice witness and tends to connect Appellant to the offense. Issues One and Two are
overruled.
INEFFECTIVE ASSISTANCE OF COUNSEL
            In Issue Three, Appellant argues that he was denied the effective assistance of counsel
because trial counsel failed to request an accomplice witness instruction. We review claims of
ineffective assistance of counsel under a two-pronged test. First, an appellant must establish
counsel’s performance fell below an objective standard of reasonableness under prevailing
professional norms. Strickland v. Washington, 466 U.S. 668, 693-94, 104 S.Ct. 2052, 80 L.Ed.2d
674 (1984); Mallett v. State, 65 S.W.3d 59, 62-63 (Tex.Crim.App. 2001). Second, the defendant
must establish that counsel’s deficient performance prejudiced the defense. Strickland, 466 U.S. at
687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693; Jackson v. State, 877 S.W.2d 768, 771 (Tex.Crim.App.
1994). Prejudice is established by showing a reasonable probability that but for counsel’s
unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S.
at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; Mallett, 65 S.W.3d at 62-63. A reasonable probability
is a probability sufficient to undermine confidence in the outcome. Mallett, 65 S.W.3d at 63. 
Claims of ineffective assistance must be proven by a preponderance of the evidence. Bone v. State,
77 S.W.3d 828, 836 (Tex.Crim.App. 2002).
            In reviewing Appellant’s claim of charge error, we concluded that the trial court’s failure to
submit the accomplice witness instruction did not cause Appellant egregious harm or result in an
unfair trial. We also concluded that the non-accomplice evidence sufficiently corroborated the
accomplice and tended to connect him to the offense. Consequently, the record does not establish
a reasonable probability that but for counsel’s error, the result of the proceeding would have been
different. Issue Three is overruled. Having overruled each issue, we affirm the judgment of the trial
court.
 
February 15, 2007                                                       
                                                                                    ANN CRAWFORD McCLURE, Justice

Before Chew, C.J., McClure, and Barajas, C.J. (Ret.)
Barajas, C.J. (Ret.), sitting by assignment, not participating

(Publish)