COURT OF APPEALS


EIGHTH DISTRICT OF TEXAS


EL PASO, TEXAS





DAVID EDUARDO GARZA,


 Appellant,


v.


THE STATE OF TEXAS,


 Appellee. 

§


 


§


 


§


 


§


 


§



§

No. 08-07-00243-CR



Appeal from


 394th District Court


of Presidio County, Texas


(TC # 2979)





O P I N I O N



 David Eduardo Garza appeals his conviction of aggravated robbery. Appellant waived his
right to a jury trial and entered a non-negotiated plea of nolo contendere. The trial court found
Appellant guilty and assessed punishment at life imprisonment. For the reasons that follow, we
affirm.

FACTUAL SUMMARY


 Following Appellant's plea of nolo contendere, the State offered evidence pertaining to the
instant offense, the aggravated assault of Billy Massie in Presidio County. Additionally, the State
tendered evidence demonstrating that the aggravated assault was one of a series of offenses which
took place between July 9 and July 13 of 2006. The first offense was the murder of Appellant's wife,
Julie Garza, in San Antonio.

 On July 9, 2006, Virginia Gonzales, a friend of Julie's, received a telephone call from Julie's
sister stating that she had been unable to reach Julie. As a result, Gonzales went to Julie's home
around 10 p.m. to check on her. The lights and television were on and Julie's vehicle was at the
residence, but she did not come to the door. Concerned, Gonzales called Julie's sister and the police. 
She also searched the neighboring area for Appellant's white vehicle. As she returned to the Garzas'
home, Appellant arrived. She asked him where Julie was, and he replied that she was inside asleep. 
Gonzales noticed that Appellant had Julie's cell phone and she asked him why he had it. Appellant
claimed that his wife had lent it to him, but Gonzales did not believe him since she knew they were
having marital problems. Appellant told Gonzales that he would go inside and check on his wife and
he asked Gonzales to wait outside. When he returned, he told Gonzales that Julie wasn't home. 
Gonzales replied that she wanted to look inside but he would not let her in, telling her repeatedly that
Julie wasn't there. Gonzales refused to leave and Appellant finally let her in. She looked inside
every room except for the bathroom because Appellant stopped her, admitting he had drugs stored
there. When Gonzales saw Julie's purse on the sofa, she again asked Appellant to let her look in the
bathroom but he refused. At this point, Gonzales left the residence and called the police because she
knew Julie would not leave her home without her car or purse. She waited for the police and
followed them to the Garzas' home. On July 30, Gonzales returned to the residence to collect Julie's
belongings. She found some men's clothing in the bedroom which she turned over to a crime scene
technician. 

 Officer Rodney Lucas of the San Antonio Police Department went to the Garzas' home on
July 9 at 11:19 p.m. to check on Julie's welfare. When he kicked open the door, he saw that a chair
had been placed under the doorknob. Lucas found Julie's body in the bathroom. 

 The medical examiner, Dr. Jennifer Rulon, determined that the cause of death was
asphyxiation and the manner of death was homicide. She also found that the victim had blunt force
trauma injuries on her head and face, abrasions around her nostrils and on the inside of her lip,
abrasions and contusions on her hands, arms and legs, a bloody torn fingernail, and a tearing injury
of the rectum. Dr. Rulon noted the presence of petechiae in the eyes which is generally associated
with strangulation or neck compression. On cross-examination, the defense inquired whether the
cause of death determination would be different had she not received additional information from
the police. Dr. Rulon explained that homicidal asphyxiation would be in the differential but the
cause of death would be undetermined. On re-direct, Dr. Rulon explained that her opinion was based
on many factors, including information provided to her by the law enforcement investigators, who
had informed her that Appellant confessed to strangling his wife by compressing her neck. 

 On July 30, Archie Anz, a crime scene technician with the San Antonio Police Department,
returned to the victim's residence and recovered a navy blue tee shirt and white sweatpants which
had been found by Gonzales in the victim's bedroom. The DNA of both the victim and Appellant
were recovered from bloodstains found on both items of clothing.

 On July 12, 2006, David Duncan, a Texas Ranger with the Texas Department of Public
Safety, investigated a wreck involving a white 1999 Pontiac Trans Am near Nunn Hill, which is
about 31 miles north of Fort Davis on Highway 118. The car had run off of an embankment and
traveled to the bottom of an arroyo. The air bags had deployed and there were no keys in the vehicle. 
The car was subsequently removed from the location and towed to a storage lot in Fort Davis. The
vehicle was registered to Hector Garza in San Antonio. Inside the car, Duncan found Julie's check
book and a July 10 credit card receipt from a convenience store in Marfa bearing Julie's name. After
Appellant was apprehended and interviewed by law enforcement officers, he told them where he had
hidden his belongings after wrecking the car. The officers went back to the scene of the accident and
located these items, which included a key ring bearing the name "Garza."

 Billy Massie was employed as a loan officer with the Federal Land Bank. On July 13, 2006,
Massie left his office in Marfa to inspect a property located on the loop in Jeff Davis County. Massie
was traveling in his Chevrolet Trail Blazer on Loop 166 past the McDonald Observatory when he
saw Appellant, who was wearing an orange construction vest, run onto the road and wave him down. 
Massie stopped and Appellant explained that he and two co-workers had been working on a holding
tank at a nearby ranch and their vehicle had broken down. Appellant had been chosen to go for help. 
Massie unlocked the door and Appellant got in the car. Massie noticed that Appellant smelled bad
as though he had been out there for a few days. Massie turned around and headed back to Fort Davis
because it was the nearest town. When Massie saw a wrecker and pointed it out, Appellant said he
didn't have any money for a wrecker. He also mentioned that he was hungry and wanted to eat first. 
After some discussion, Appellant said he did not want to stop in Fort Davis but wanted to travel to
Alpine. Massie explained that he was not going to Alpine but would be going back to his office in
Marfa. Appellant decided that he would go to Marfa because one of his co-workers had an uncle
there. During the drive to Marfa, Appellant asked Massie if he had any family and Massie replied
that he was married. When Massie asked Appellant if he had a family, he mentioned only having
children. Once in Marfa, Appellant and Massie began looking for the house of the co-worker's uncle
and Appellant directed him to a road leading out of town. Appellant then pulled out a butcher knife
and grabbed Massie's collar while demanding money. Massie gave him his wallet and Appellant
instructed him to get out of the car. Massie stopped the car and exited and Appellant followed him. 
Massie repeatedly told Appellant to not hurt him and to take the car. Despite assuring Massie he
would not hurt him, Appellant stabbed him in the neck while holding onto his collar with the other
hand. Massie tried to defend himself as Appellant stabbed him numerous times. At one point,
Massie was on one knee and Appellant stabbed him in the eye. Massie began fighting back harder
and was able to get Appellant on the ground. Massie moved to the opposite side of the car and
Appellant got in the car and left, leaving Massie there on the side of the road. Massie walked back
towards Marfa and stopped in front of Fowlkes Cattle Company where he flagged down a passing
truck for assistance. 

 Roy Melvin was driving by Fowlkes Cattle Company when he saw a man trying to flag him
down. Melvin and his son got out of their truck and approached the man who was covered in blood. 
After speaking with the man briefly, Melvin called 911. Deputy sheriffs and an ambulance
responded to the scene and Massie was transported to the Big Bend Regional Medical Center in
Alpine. Bert LaGarde, one of the paramedics, testified that if Massie had not been provided
treatment quickly for his stab wounds, there is a high probability he would not have survived. 
Dr. George Alsop, a general surgeon, treated Massie upon his arrival at the emergency room. Massie
had a total of eleven stab wounds to his head, neck, face, chest, abdomen, and arms. According to
Dr. Alsop, the wounds were bleeding extensively when he arrived at the emergency room, and if
pressure had not been applied before his arrival it is likely he would have bled to death. Dr. Alsop
immediately performed surgery to explore the extent of the internal injuries and to close a wound
to Massie's diaphragm. Dr. Alsop tied off the bleeders in the multiple large lacerations and closed
all of the wounds. Massie lost about half of his blood volume as a result of the wounds. The
following day, Massie was transferred to El Paso because Dr. Alsop was concerned about the wound
to the eye and because of an abnormal finding on a CT scan.

 Shortly after the Presidio County Sheriff's Office responded to the 911 call, law enforcement
authorities in the area were provided with a description of Massie's Trail Blazer and license plate
number. Emmit Charles Moore, Jr., a highway patrolman with the Texas Department of Public
Safety, spotted the vehicle on July 13, 2006 traveling on the service road of Interstate 20 at milepost
40 and the intersection of Texas Highway 17. Moore initiated a traffic stop and the vehicle pulled
over to the side of the road. Moore ordered Appellant to step out, but instead he stuck his head out
of the window and waved, indicating he wanted Moore to walk over to the vehicle. Moore again
ordered Appellant to step out, but Appellant put the car in gear and drove off. Moore, joined by
other law enforcement officers, began pursuit of Appellant traveling at speeds between 45 and 100
miles per hour on Interstate 20 through several towns. The Department of Public Safety utilized
spike strips on six or seven different occasions during the pursuit in an effort to deflate the tires of
Appellant's vehicle, but they were not successful until they reached Odessa at milepost 109. At that
location, Appellant stopped in a barrow ditch and exited the car, but he kept one hand inside of his
pocket to indicate that he had a weapon. He quickly pulled his hand out as though he had a weapon
but he had a wallet in his hand which he threw on the ground. Appellant jumped back in the car
before he could be taken into custody and took off again. Ranger Jess Malone quickly disabled the
tires with a rifle but Appellant did not stop immediately. Malone fired a final shot into the engine;
Appellant stopped and was taken into custody. 

 During the punishment phase, the State also introduced evidence that Appellant had final
felony convictions for possession of marihuana, delivery of a controlled substance, and burglary of
a habitation. The trial court assessed Appellant's punishment at life imprisonment and ordered him
to pay restitution in the amount of $90,000 for Massie's medical bills. 

ADMISSION OF BAD ACT


 In Issue One, Appellant contends that the evidence admitted during the punishment hearing
was insufficient to establish beyond a reasonable doubt that he murdered his wife in San Antonio
five days before he committed the instant offense, and therefore, the trial court erred by considering
it in assessing his punishment. The State responds that Appellant failed to preserve error in the
admission of this evidence. Alternatively, the State asserts that the evidence is sufficient.

 Article 37.07, § 3(a)(1) provides:

 Regardless of the plea and whether the punishment be assessed by the judge or the
jury, evidence may be offered by the state and the defendant as to any matter the
court deems relevant to sentencing, including but not limited to the prior criminal
record of the defendant, his general reputation, his character, an opinion regarding
his character, the circumstances of the offense for which he is being tried, and,
notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of
an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence
to have been committed by the defendant or for which he could be held criminally
responsible, regardless of whether he has previously been charged with or finally
convicted of the crime or act.


Tex.Code Crim.Proc.Ann. art. 37.07 § 3(a)(1)(Vernon Supp. 2008).

 The State first argues that Appellant did not preserve his complaint. However, whether an
extraneous offense or bad act was established beyond a reasonable doubt is a question of fact for the
trier of fact, not a preliminary question of admissibility for the trial court. Vicioso v. State, 54
S.W.3d 104, 120 (Tex.App.--Waco 2001, pet. ref'd), citing Mitchell v. State, 931 S.W.2d 950, 953
(Tex.Crim.App. 1996); see also Nanez v. State, 179 S.W.3d 149, 151-52 (Tex.App.--Amarillo 2005,
no pet.). Therefore, Appellant's failure to obtain a ruling on his objection to the admission of the
evidence does not preclude our review of this issue. 

 Generally, in reviewing the legal sufficiency of the evidence, we view the evidence in the
light most favorable to the verdict, and determine whether any rational trier of fact could have found
the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S.
307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); Geesa v. State, 820 S.W.2d 154, 159
(Tex.Crim.App. 1991), overruled on other grounds by Paulson v. State, 28 S.W.3d 570
(Tex.Crim.App. 2000). This standard of review is also applicable to bench trials. See Diaz v. State,
902 S.W.2d 149 (Tex.App.--Houston [1st Dist.] 1995, no pet.). Applying the Jackson v. Virginia
standard to the issue before us, we must determine whether the trier of fact could have found beyond
a reasonable doubt that Appellant committed the murder of his wife.

 The evidence at admitted at trial established that Appellant was present at Julie's residence
shortly before her body was found in the bathroom by police. He told inconsistent stories, first
telling Gonzales that his wife was sleeping and later explaining that she wasn't home. Appellant also
had an injury on his face just below his eye. Appellant initially prevented Gonzales from entering
the home to check on Julie's welfare. When she insisted on going inside, Appellant would not let
her look in the bathroom, which is where Julie's body was found moments later. Men's clothing
stained with both Appellant's and Julie's blood was recovered from the bedroom. There was a
bloody linear marking on the tee shirt consistent with having been made by a broken fingernail. The
medical examiner found that Julie had a bloody fingernail and her DNA was extracted from this
linear marking. Aware that Gonzales was concerned about Julie's welfare, Appellant fled San
Antonio and traveled several hundred miles to the west Texas where he used Julie's credit card on
July 10. When law enforcement officers tried to stop him, he led them on a high speed chase for
several miles and stopped only when the vehicle was disabled by spike strips and gunfire.

 Evidence showing a consciousness of guilt may be one of the strongest indicators of guilt. 
Johnson v. State, 234 S.W.3d 43, 55 (Tex.App.--El Paso 2007, no pet.); Torres v. State, 794 S.W.2d
596, 598 (Tex.App.--Austin 1990, no pet.). Any conduct on the part of a person accused of a crime
subsequent to its commission, which indicates a "consciousness of guilt" may be received as a
circumstance tending to prove that he committed the act with which he is charged. Torres, 794
S.W.2d at 598. Evidence of flight shows a consciousness of guilt. Bigby v. State, 892 S.W.2d 864,
884 (Tex.Crim.App. 1994).

 Even excluding from consideration the hearsay statement that Appellant admitted strangling
his wife, the evidence admitted at trial, including the consciousness of guilt evidence, is sufficient
for a rational trier of fact to find beyond a reasonable doubt that Appellant committed the murder. 
We overrule Issue One.

THE HEARSAY STATEMENT


 In Issue Two, Appellant argues that the trial court abused its discretion by permitting
Dr. Rulon to testify that she had been told by law enforcement investigators that Appellant had
admitted strangling his wife by neck compression. We review a trial court's decision regarding the
admissibility of evidence for an abuse of discretion. Rodriguez v. State, 203 S.W.3d 837, 841
(Tex.Crim.App. 2006). This standard requires an appellate court to uphold a trial court's decision
to admit evidence decision when that decision is within the zone of reasonable disagreement. Id. 
An appellate court would misapply the appellate abuse of discretion standard of review to reverse
a trial court's admissibility decision solely because the appellate court disagreed with it. Id.; see also
Robbins v. State, 88 S.W.3d 256, 259-60 (Tex.Crim.App. 2002).

 "Hearsay" is a statement, other than one made by the declarant while testifying at trial,
offered in evidence to prove the truth of the matter asserted. Tex.R.Evid. 801(d). Hearsay is not
admissible except as provided by statute, the rules of evidence, or a rule promulgated pursuant to
statutory authority. Tex.R.Evid. 802. The facts or data upon which an expert bases an opinion or
inference need not be admissible in evidence if they are of a type reasonably relied upon by experts
in the particular field in forming opinions or inferences on the subject. Tex.R.Evid. 703. Thus, an
expert's opinion may be based on hearsay if the hearsay is the type of information reasonably relied
upon by experts in the particular field in forming opinions or inferences on the subject. See
Richardson v. State, 83 S.W.3d 332, 351 (Tex.App.--Corpus Christi 2002, pet. ref'd). An expert
witness may disclose on direct examination or be required to disclose on cross-examination the
underlying facts or data supporting his expert opinion or inference. Tex.R.Evid. 705(a). When the
underlying facts or data are inadmissible, the trial court shall exclude the underlying facts or data if
the danger that they will be used for a purpose other than an explanation or support for the expert's
opinion outweighs their value as explanation or support or are unfairly prejudicial. Tex.R.Evid.
705(d).

 On direct examination, Dr. Rulon expressed her expert opinion that the cause of death was
asphyxiation by strangulation. Appellant challenged the basis for that opinion and established that
if Dr. Rulon disregarded all information except for the autopsy findings, her opinion on the cause
of death would be different in that she would state that the cause of death was undetermined. 
Dr. Rulon added that asphyxiation would be included in her differential. On re-direct, Dr. Rulon
explained that in forming an opinion on the cause of death and manner of death, forensic pathologists
incorporate the findings at autopsy, all other ancillary studies, such as toxicology and microscopic
findings, and the facts provided by law enforcement officers who are investigating the case. In this
particular case, her opinion as to the cause of death was based, in part, on a statement by a law
enforcement officer that Appellant had confessed to strangling his wife by compressing her neck. 
Dr. Rulon's testimony about Appellant's statement is therefore admissible pursuant to Rule 703(a). 
See Austin v. State, 222 S.W.3d 801, 812 (Tex.App.--Houston [14th Dist.] 2007, pet. ref'd)(summary
of interview of defendant's husband's father during psychological evaluation of defendant was
admissible under hearsay exception to show basis of expert opinion; licensed psychologist testified
that background information, such as interviews with defendant's family members, was important
in his assessment of defendant and whether she had Munchausen Syndrome by Proxy, most of the
hearsay statements, particularly regarding defendant's lying, drawing attention to herself, and
intentionally making her child sick, directly supported psychologist's opinions, and disclosing this
information assisted jury in evaluating weight to give psychologist's opinions). The trial could did
not abuse its discretion by overruling Appellant's hearsay objection. Further, Appellant did not
object under Rule 705(d). We overrule Issue Two and affirm the judgment of the trial court.


May 20, 2009 

 ANN CRAWFORD McCLURE, Justice


Before Chew, C.J., McClure, and Carr, JJ.

Carr, J., not participating


(Do Not Publish)