COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | |
|---|---|---|
| YARA PEREZ, | | No. 08-12-00340-CR |
| Appellant, | § | |
| | § | Appeal from the |
| v. | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20100D01057) |
| | § | |

## **O P I N I O N**

Yara Perez was found guilty of capital murder and injury to a child by omission in the death of her three-year-old daughter, Jacqueline ("Jackie") Gonzalez. On appeal, she complains of the sufficiency of the evidence (Issue One), of the jury charge (Issue Two), and of the exclusion of evidence (Issues Three and Four). We affirm.

### **FACTUAL AND PROCEDURAL BACKGROUND**

Sometime before midnight on November 19, 2007, Jackie's lifeless body was found by police officers responding to a report of a three year-old child in distress. The report was made by Abigail Castaneda, the sister of Perez's then-live-in boyfriend, Francisco Castaneda.[1] When Abigail called 911 at approximately 11:00 p.m. that evening, she reported that she had earlier seen,

---

[1] It is unclear from the record whether Castaneda signed the apartment lease. However, neither party on appeal disputes Castaneda's status as Perez's live-in-boyfriend.

Perez's daughter, Jackie, lying on the floor of Perez's apartment and Jackie was not breathing and may be dead. Abigail reported to 911 that if Perez and Castenada heard sirens they may kill themselves.

Police officers, along with emergency medical personnel, responded almost immediately. The officers knocked on the apartment's door and windows, announcing their presence and imploring the occupants to open the door. There was no response initially, but a few minutes later the officers spotted a female peering through the window blinds. The officers responded by forcibly entering the apartment.

While searching for Jackie, some of the officers encountered Perez in a bedroom clutching a little girl against her body. Perez yelled at the officers to "get out" and that they "have no right to be" in the apartment. The officers asked to check on the child and Perez said "no" that she was asleep. The responding paramedic asked to see the girl Perez was holding but she was evasive and he repeated his request to check on the little girl until Perez finally relented. When the paramedic asked Perez if this is the patient she responded "yes." Officer Martinez observed Perez to be "very nervous" while still yelling at them "to get out." Perez would vacillate between cooperating and not cooperating. When Perez was asked by the officers if the girl she is holding was the child they are looking for, Perez said yes. But the little girl was in fact Jackie's five-year-old sister, Yara, who was examined by medical personnel and declared to be fine. Responding medical personnel noted Perez was uncooperative and refusing to give any information as to what had happened. Castaneda is in the living area during this time. The officers, however, learned from Abigail that another child was in the apartment. They confronted Perez with this information and asked her the whereabouts of the other child. When officers first

2

asked where was Perez's other child, Perez did not answer and began crying. Then Perez replied contradictorily that: (1) the child was with her father; (2) the child was with her grandfather; and lastly (3) she did not know where the child was. The officers frantically resumed their search for Jackie inside the apartment. Officers repeatedly ask Perez the whereabouts of Jackie to no avail.

Meanwhile, Abigail had told one of the responding officers that Castaneda's car was parked in the apartment complex's parking lot.[2] The officer searched the car and found a small blue hamper in the trunk. When the hamper tipped over, the officer discovered Jackie's body inside it. Castaneda's fingerprint was found on the handle of the tub, and a mixture of DNA from Jackie and Perez was found on the blue blanket in which Jackie's body was wrapped. The paramedic at the scene observed Jackie was not breathing and cold to the touch; her eyes were open and glazed; rigor mortis was beginning to set in which led him to conclude Jackie had been dead for some time. The responding detective observed that Jackie's body was covered with numerous bruises to include her cheek, chin, temporal area, abdomen, and chest.

Abigail testified she had called Perez sometime before 7:00 p.m. that day looking for her brother, Castaneda. Perez told her Castaneda was busy and could not come to the telephone and she was also busy. Later, Perez called Abigail on her cell phone sometime between 8:30 p.m. and 10:00 p.m. that evening. Abigail heard Perez crying stating "I'm going to kill myself. The baby is not breathing. I'm not sure if she is dead or alive." Abigail asks Perez "[w]hat do you mean you are not sure? What's wrong with the baby?" Abigail said Perez gave her two different explanations.

First, Perez tells Abigail the baby had fallen off the balcony. Second, Perez told Abigail, the baby had fallen from the bed and that she was hurt and "she didn't know if she was breathing or

---

[2] Perez drove the car and made payments towards it.

3

she was alive." Abigail states Perez is "crying and crying . . . telling me she wasn't sure if the baby was breathing or alive." Abigail tells Perez "to call for help, to call the ambulance several times." According to Abigail, the call was disconnected and Abigail repeatedly called Perez's apartment until finally Perez answered. Perez is still crying hysterically and telling Abigail she was not sure what happened to the baby. Perez would hang up and Abigail continually would call back asking to speak to Castaneda. Abigail did not speak to her brother. Abigail leaves work and goes to Perez's apartment to find out what "was really going on."

Abigail arrives at Perez's apartment and knocks on the door. After several knocks Perez answers the door, but will not allow Abigail into the apartment. Perez opens the door, no more than twelve to eighteen inches, with Castaneda behind her, both are crying. Abigail sees Jackie lying on the living room floor. Jackie is laying down face up, not moving and does not seem to be breathing. Abigail demands to be allowed in. Perez refuses and Abigail slaps her to try to gain entrance into the apartment. Perez closes the door. Abigail tells Perez and Castaneda that she is calling the police.

Instead of calling the police, Abigail returns to work and continues to call Perez until Perez finally answers the phone. Abigail asks Perez if she has called the police, Perez tells her in "a very calm voice" that the police and ambulance are at the apartment checking the baby. Later, after a long time, Abigail receives another telephone call from Perez. Perez is crying hysterically telling Abigail "the baby wasn't breathing; and she was going to kill herself for what happened to Jackie." Eventually, Abigail leaves for work again and picks up her husband. They go to Perez's apartment, calling 911 on the way. Abigail waits for the police and points out Perez's apartment to them. She also tells police to "go back and check the apartment. There is a

4

three-year-old little girl missing." Abigail also identifies the vehicle Perez and Castaneda drive and instructs the police to look there. Abigail watches as the police officers find Jackie's body in the trunk of the car.

In her video recorded statement, Perez stated she left home about 8:15 a.m. that day and on her way to work she dropped off her older daughter, Yara, at school. Perez worked at a cardiology clinic as a medical assistant. She told Jackie to lay down with Castaneda. She called Castaneda from work three or four times. During one of their conversations Castaneda told her Jackie was taking a bath because she had urinated on herself. He told Perez that he threw her into the bath with her pajamas on. Perez left work and arrived home around 2:00 p.m. She spoke to Jackie and kissed her, observing a bruise on her cheek, three more bruises on her chin and a "mesh-like" scrape on her face. She asked Castaneda what happened and he told her 'just leave me alone" and sat on the couch. Perez said she asked Castaneda two or three times how did Jackie get bruised but he refused to answer her. Perez let it go because she asserted he would hit her.

She prepared something for Castaneda and Jackie to eat. She served Jackie a plate. Perez, then left Jackie with Castaneda, went to pick up Yara from school and run an errand for Castaneda. Jackie and Castaneda were in the apartment when she and Yara returned home. Jackie had still not eaten her food, telling Perez "she didn't want it" and that "it grossed her out." Castaneda told Jackie to eat her food. Perez said she told Castaneda Jackie did not want to eat it. Castaneda put Jackie to bed. According to Perez, sometime after that, Jackie got up to go to the bathroom. Perez noticed Jackie was stumbling and went to help her. Castaneda held Jackie on the toilet. Jackie started to complain her stomach hurt. Castaneda told Perez to go the store to

5

get rubbing alcohol. Perez went alone to the store after Castaneda had placed Jackie on the sofa. Perez and Castaneda began to massage Jackie's stomach with rubbing alcohol. Perez made Jackie some tea and Kool-Aid. When she returned Jackie began throwing up and felt cold to the touch. Perez took Jackie's temperature with a digital thermometer. Perez stated Jackie's temperature was 87 degrees or "something like that" and that it was low. Perez told Castaneda she should call an ambulance. Perez said Castaneda would not let her, because he had the phone. She stated if she attempted to leave and call 911, Castaneda would have thrown her on the floor. She admitted he did not restrain her in any way. Perez says she told Castaneda that Jackie needed to go to the hospital because she was too cold and she was not doing well.

Perez stated Jackie died in front of her. According to Perez, she kept checking Jackie's heart and was unable to hear anything. Perez said she knew Jackie's heart stopped beating. Perez performed CPR on Jackie. Jackie threw up, and then took a slow breath. When asked if she called an ambulance, she replied no. Perez told Castaneda, "I needed to take her to the hospital." Perez said Castaneda told her, "we couldn't, we couldn't because if we did they were going to take Yara, and they were going to take me and they were going to take him. . . . We couldn't. He wanted to." Perez threw herself on the floor "because I wanted to do something." Castaneda held her while she was on the floor and told her "that he was going to kill himself and the best thing would be was for him and me to kill ourselves." Castaneda told Perez that she could kill him first and then kill herself or he would kill her and then he could kill himself. She told him no and "not to be a coward." Perez went to her room while Castaneda went to the kitchen, got a knife and threw it into her room. She asked, "What are you doing with that?"

6

According to Perez, Castaneda replied, "I can't live with this." Castaneda said he wanted to die. Perez told him "no just to call the police and he wouldn't."

Perez stated Castaneda put Jackie in the trunk of the car. Perez said as she was lying on the floor, Castaneda told her to get up. Perez told him, "that I couldn't" and he said "he wanted to take her and bury her somewhere." Castaneda wanted to go to Mexico and bury her. Perez told him "no, my baby didn't deserve that." Perez stated she wanted Jackie's family to know "It was him. It was him and I don't care how many times I have to say it over and over again. It was him. It was him. If it wasn't for [Castaneda] my baby would be alive. If it wasn't that I didn't call if I didn't I would have taken her to the hospital my baby would be alive, but he didn't let me. He didn't let me. Why, why didn't he let me?"

Officers noted upon initially entering the apartment, Perez was not calling for help, had no signs of injury nor had she been restrained in any manner. When Perez was told Jackie had been found in the trunk of the vehicle, Perez did not respond. As Perez was escorted from the apartment, she begged officers not to walk her by the trunk of the car.

An autopsy would later reveal that Jackie sustained at least seventy impact points and died from internal bleeding as a result of blunt force trauma to her abdomen. The forensic pathologist, Dr. Contin, conducted an external examination that revealed bruising to Jackie's right mastoid area, left cheek, chin, and right mandible area. She also exhibited bruising inside her lip; fifteen overlapping bruises in her chest area measuring six inches by three inches; ten separate bruises below her belly button measuring two inches by three inches in area; six separate bruises in left abdomen measuring four by three inches in area; two purple bruises outside of her left thigh; two bruises next to each other where the pelvic meets the abdomen; one small bruise on right hip; three

7

purple bruises on the right knee; two light purple bruises on left knee; one light purple bruise on the ankle; five purple bruises back of the right hand on the wrist; bruises on the back of the fingers of the left hand; and on her back the bruising is so numerous it cannot be counted, measuring seven and a half inches by six and a half inches.

According to Dr. Contin, the medical evidence establishes that Jackie would have been rendered immobile by the deathblow to her abdomen and would have likely died from that blow one to two hours later. He testified that it is an extremely painful way to die and if Jackie had received timely medical care, she could have been saved. Dr. Contin concluded Jackie's death was a homicide as the result of physical abuse.

Perez was indicted for capital murder by striking Jackie with an unknown object or striking Jackie's body against an unknown object.[3] Count Two of Perez's indictment was injury to a child, by omission, causing serious bodily injury to Jackie by failing to provide care, protection, and control to Jackie when Perez had a legal duty and statutory duty as a parent to act. Although the indictment did not contain allegations that Perez was culpable as a party to both offenses, the State argued at trial that Perez was liable either as a principal or as a party. The trial court's charge accordingly instructed the jury on the law of parties. Perez was found guilty of capital murder and injury to a child by omission and assessed a sentence of life and thirty-five years, respectively, to run concurrent.

## SUFFICIENCY OF THE EVIDENCE

In her first issue, Perez claims the evidence is insufficient to sustain both of her convictions. We disagree.

---

[3] Castaneda was also indicted for capital murder, and the jury found him guilty. We upheld his conviction on direct appeal. *Castaneda v. State*, No. 08-10-00050-CR, 2011 WL 4490960 (Tex.App.--El Paso Sept. 28, 2011, pet. ref'd)(not designated for publication).

8

### Standard of Review

The legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), is the only standard a reviewing court applies in determining whether the evidence is sufficient to support a conviction. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010). When reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007), *quoting Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89.

Under a legal sufficiency review, we may not substitute our judgment for that of the jurors, who are the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We therefore defer to the jurors' resolution of these issues and to their responsibility to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13, *citing Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89. In resolving what the facts are and what reasonable inferences may be drawn from them, the jurors may accept one version of the facts and reject another, and they may reject any part of a witness's testimony, even if uncontradicted. *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000), *overruled on other grounds*, *Laster v. State*, 275 S.W.3d 512 (Tex.Crim.App. 2009); *Henderson v. State*, 29 S.W.3d 616, 623 (Tex.App.--Houston [1st Dist.] 2000, pet. ref'd). "[I]t is not necessary that every fact point directly and independently to the defendant's guilt. It is enough if the conclusion is warranted by the combined and

9

cumulative force of all the incriminating circumstances." *Livingston v. State,* 739 S.W.2d 311, 330 (Tex.Crim.App. 1987).

If the record supports conflicting inferences, a reviewing court presumes the fact finder resolved the conflicts in favor of the State and we defer to that determination. *Clayton v. State,* 235 S.W.3d 772, 778 (Tex.Crim.App. 2007). In *Hooper,* the Court permitted juries to draw multiple reasonable inferences from the evidence, however they are not to draw conclusions based on speculation. 214 S.W.3d at 15. The Court of Criminal Appeals explained "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them. Speculation is mere theorizing or guessing about the possible meaning of facts and evidence presented." *Id.* at 16. So while a conclusion based on speculation may be reasonable, such a conclusion based upon insufficient facts or evidence cannot support a conviction beyond reasonable doubt. *Id.*

### *Hypothetically Correct Jury Charge*

The sufficiency of the evidence is measured by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex.Crim.App. 1997). A hypothetically correct charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.* If the hypothetically correct jury charge for the case would authorize the jury to convict on alternative theories of liability, then the appellate court must deem the evidence sufficient if it is sufficient under any of the theories of liability. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004).

10

In the case at hand, the application paragraphs of the charge authorized the jury to convict Perez as a principal, and the abstract portion of the charge instructed the jury on the law of parties. The abstract portion of the charge properly explained the law of party liability under Sections 7.02(a)(2) and 7.02(a)(3) of the Texas Penal Code. *See* TEX.PENAL CODE ANN. §§ 7.02(a)(2)-(3) (West 2011). Given the nature of the evidence and arguments at Perez's trial, the hypothetically correct jury charge for this case would have authorized the jury to convict her as a party under both Sections, 7.02 (a) (2) and (3). That the application paragraph of the charge actually given applied only the theory that Perez was liable as a principal actor is irrelevant when reviewing the sufficiency of the evidence.[4] *See Garza Vega v. State*, 267 S.W.3d 912, 916 (Tex.Crim.App. 2008).

### *Applicable Law*

To convict Perez of capital murder, the State bore the burden of proving that she intentionally or knowingly caused Jackie's death. *See* TEX.PENAL CODE ANN. §§ 19.02(b)(1), 19.03(a)(8)(West Supp. 2014).[5]

Under the law of parties, "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX.PENAL CODE ANN. § 7.01(a). A person is "criminally responsible" for an offense committed by another if:

> (2) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense;

---

[4] Of course, it is relevant in reviewing error in the charge, which is the complaint Perez raises in her second issue.

[5] In 2007, a person was guilty of capital murder if the victim was younger than six years' of age. Act of May 28, 1993, 73rd Leg., R.S., ch. 887, § 1, 1993 TEX.GEN.LAWS 3529. In 2011, the capital murder statute was amended. Act of May 28, 2011, 82nd Leg., R.S., ch. 1209, § 1, 2011 TEX.GEN.LAWS 3235, 3236. As the statute now reads, a person is guilty of capital murder if the victim is younger than ten years' of age. TEX.PENAL CODE ANN. § 19.03(a)(8)(West Supp. 2014).

11

or

(3) having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, he fails to make a reasonable effort to prevent commission of the offense.

TEX.PENAL CODE ANN. § 7.02(a)(2)-(3).

To convict her of injury to a child by omission, the State was required to prove that she "intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, cause[d] to a child . . . serious bodily injury . . . if . . . the actor has a legal or statutory duty to act . . . ." *See* TEX.PENAL CODE ANN. § 22.04(a), (b)(West Supp. 2014). Pursuant to Section 151.001 of the Texas Family Code, a parent has the legal obligations, among others, to protect her children and to provide them with medical care. *See* TEX.FAM.CODE ANN. § 151.001(a)(2)-(3)(West 2014).

### 1. Capital Murder

Perez contends the State failed to prove she was guilty as a principal actor because there is no direct evidence she struck Jackie with an object or against a surface, killed Jackie in the course of committing another crime, or was present when Jackie suffered her fatal injuries. She points to the lack of incriminating statements in her interview with the police and to the admissions of the medical experts that they could not identify the object or objects which may have been used to injure Jackie. In other words, Perez is contending no rational jury could have found the elements of both offenses beyond a reasonable doubt because the evidence against her is entirely circumstantial.

But the standard of review in a sufficiency challenge is the same for both direct and circumstantial evidence, and circumstantial evidence, coupled with all reasonable inferences from

12

that evidence, is as probative as direct evidence in establishing the guilt of an actor. *Guevara*, 152 S.W.3d at 49. Each fact need not point directly and independently to a defendant's guilt, as long as the combined and cumulative force of all the incriminating facts would have permitted a jury to rationally conclude each element of the crime was proved beyond a reasonable doubt. *Id*. Thus, we may consider circumstantial evidence such as the defendant's acts, words, and conduct before, during, and after the commission of the offenses, including evidence consisting of inconsistent statements, impossible explanations, and attempts to conceal incriminating evidence. *Id*. at 50.

Perez argues the evidence is insufficient to support her convictions as a party to both offenses because:

> [T]here was never any evidence to demonstrate that [she] was a party to the killing of [her] daughter during or after arrest. The State . . . never presented any evidence that [she] took any action to indicate that she had any participation in the actions that killed her daughter.

As best we can surmise, Perez is contending she is not liable as a party under Section 7.02(a)(2) because circumstantial evidence of acts, words, and conduct after the fact are insufficient as a matter of law to prove she did anything in connection with the offenses before they occurred.

Perez is correct in that mere presence of a person at the scene of a crime, without more, is insufficient to support a conviction as a party to the offense. *Gross v. State*, 380 S.W.3d 181, 186 (Tex.Crim.App. 2012). But if the evidence shows that the defendant was physically present at the commission of the offense and encouraged its commission by words or by agreement made before or contemporaneously with the act, the evidence is sufficient to support a conviction as a party. *Gross*, 380 S.W.3d at 186, 188; *Carson v. State*, 422 S.W.3d 733, 741 (Tex.App.--Texarkana 2013, pet. ref'd). Collectively, a defendant's acts, words, and conduct before, during, and after the commission of an offense are probative of wrongful conduct and can constitute sufficient

13

evidence of an understanding and common design to commit the offense. *Guevara*, 152 S.W.3d at 49.

Based on the charge in this case, the jury could have found Perez guilty of capital murder under the State's three alternative theories. Perez could have been found guilty as (1) a principal actor in inflicting the fatal injury that caused Jackie's death, or as (2) a party pursuant to Section 7.02(a)(2), the aiding theory, or as (3) a party pursuant to Section 7.02(a)(3), the legal-duty theory. When the charge authorizes the jury to convict the defendant on more than one theory, such as the case at hand, the guilty verdict will be upheld if the evidence is sufficient under any theory authorized by the jury charge. *Guevara*, 152 S.W.3d at 49. *See Rabbani v. State*, 847 S.W.2d 555, 558 (Tex.CrimApp. 1992).

We find that the evidence is sufficient under the legal-duty theory, therefore we address only her arguments that apply to that theory. The evidence was sufficient for the jury to reasonably infer that Perez participated in Jackie's murder under the legal-duty theory. Because she had a legal duty to prevent Castaneda from striking Jackie, but, acting with intent to promote or assist the offense, failed to make a reasonable effort to prevent the commission of the offense. *See* TEX.PENAL CODE ANN. § 7.02(a)(3). Perez does not address the sufficiency of the evidence on the legal-duty theory in her brief, instead solely focusing on the aiding theory.[6]

Perez does not dispute she was the mother of Jackie and had the legal duty to protect and provide medical care to her. Further, Perez does not dispute the immediate cause of Jackie's death nor that she died as the result of physical abuse. However, the defense expert, Dr. Griest, believed that Jackie would have only suffered "some dull pain" from the fatal blow, and had a poor

---

[6] It appears that Perez is not challenging the legal sufficiency of the evidence to support her conviction as a party under Section 7.02(a)(3), the legal-duty theory. Neither she nor the State discuss party liability under that statute.

14

chance of surviving this injury. Dr. Griest testified that some of Jackie's bruising were "pattern" injuries, that is, could be matched up to fists. Dr. Griest took measurements and photographs of Perez's and Castaneda's hands for comparison to the pattern bruising found on Jackie's body. Dr. Griest concluded that Castaneda's knuckles matched the pattern of Jackie's injuries.

Perez and Castaneda were the only two adults in the apartment with access to Jackie before, during, and after the commission of the crime. They were both present when Abigail saw Jackie lying unresponsive on the apartment floor and when Perez would not permit Abigail to enter the apartment to examine Jackie. Perez admitted, earlier that day, Castaneda had thrown Jackie in the tub while babysitting her and that, when she came home from work, she saw bruises and lacerations on Jackie's body but did nothing about them.

Perez admits that Jackie died in front of her. Perez, by her own admission left and came back to the apartment no less than three times that day, to go to work, to pick up Yara, and to go to the store for rubbing alcohol. Perez admits she was not restrained. In fact, Perez states in response to her request to take Jackie to the hospital, Castaneda told her "we couldn't, we couldn't because if we did they were going to take Yara, and they were going to take me and they were going to take him. . . . We couldn't. He wanted to." Thus, medical assistance for Jackie was not obtained. Perez's tacit acknowledgement of the truth of Castaneda's statement would allow the jury to reasonable infer that she and Castaneda participated in the seventy impact points of injury Jackie suffered. Their refusal to seek medical treatment for Jackie grew out of their concern of being detected. Further, it demonstrates that Castaneda never physically stopped Perez from seeking medical treatment for Jackie, but rather she was persuaded when he reminded her of the consequences flowing from their joint culpability.

15

Evidence showing a consciousness of guilt may be one of the strongest indicators of guilt. *Johnson v. State,* 234 S.W.3d 43, 55 (Tex.App.--El Paso 2007, no pet.); *Torres v. State,* 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.). The defendant's conduct subsequent to the commission of a crime, which indicates a "consciousness of guilt" may be received as a circumstance tending to prove that he committed the act with which he is charged. *Torres,* 794 S.W.2d at 598. Further, a defendant's failure to contact the police and attempt to conceal the victim's body may be relevant to the question of his consciousness of guilt, or lack thereof, and his overall mental state. *See Lee v. State,* 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref'd). A defendant's false statements to cover up a crime is evidence indicating a consciousness of guilt, and is admissible to prove the commission of the offense. *King v. State,* 29 S.W.3d 556, 565 (Tex.Crim.App. 2000). In addition, evidence of a defendant's nervous and evasive behavior may show a consciousness of guilt. *Lassaint v. State,* 79 S.W.3d 736, 744 (Tex.App.--Corpus Christi 2002, no pet.).

We further note that "inconsistent statements [] and implausible explanations to the police are probative of wrongful conduct and are also circumstances of guilt." *Guevara*, 152 S.W.3d at 50. Perez, sometime between 8:30 pm and 10:00 pm, called Abigail hysterical that Jackie had fallen from a balcony, then a bed and was not breathing. Jackie was found sometime before midnight manifesting rigor mortis and paramedics surmised she had been dead for some time. During the period of time from the first hysterical phone call to Abigail and the eventually discovery of Jackie's lifeless body, Perez's behavior evidences her consciousness of guilt.

The fact that Perez is crying hysterically in her calls to Abigail and threatening to kill herself allows for an inference of consciousness of guilt. Abigail instructs her to call an

16

ambulance. She fails to do so which further demonstrates her guilty conscience. Perez opens the door but refuses Abigail entrance and closes the door but not before Abigail sees Jackie lying still on the living room floor. Perez tells Abigail that Jackie is receiving medical treatment, when in fact, Jackie does not. These statements and actions contribute to a reasonable inference of Perez's guilt.

Perez refuses to open the door when the police arrive and they have to force the door open and find her in a bedroom holding her oldest daughter, Yara. She refuses to tell them where Jackie is and yelling at them to get out. She attempts to hold out Yara as the missing child. When confronted with the existence of a second child, she tells police officers that Jackie is with her father, Jackie is with her grandfather and lastly, she does not know where Jackie is. Although Perez in her video recorded statement to police reveals she knew where Jackie was the entire time the officers where desperately searching the apartment for her. Perez begs the officer not to walk her next to the car in which Jackie's body is found. Every action Perez took allowed the jury to infer her behavior was the result of her knowledge of her guilt.

Finally, the manner in which Jackie's body was disposed of, allowed the jury to infer that Perez attempted to conceal evidence of the offense. This is, yet, another circumstance supporting the finding that Perez promoted or assisted in the physical abuse of Jackie.

We hold there was sufficient evidence for a rational jury to conclude that Perez, acting with intent to promote or assist the commission of the offense, did not make reasonable efforts to prevent Castaneda from striking Jackie. We therefore overrule the remainder of Perez's argument challenging her conviction for capital murder.

**Injury to a Child by Omission**

17

It is undisputed that Perez, as Jackie's natural and custodial parent, had a duty to protect Jackie and to provide medical care for her. The medical examiner testified that, immediately after Jackie sustained her deathblow, she would have been rendered immobile, in shock, and would have experienced severe pain. Jackie's injury would have been obvious to anyone who saw her, and the medical examiner testified that Jackie's life could have been saved if she had received medical care shortly after her injury. But Perez did not seek medical care for Jackie, even after Jackie had stopped breathing. Instead, Perez attempted to resuscitate Jackie on her own—to no avail.

Abigail told Perez to seek medical treatment for Jackie. Perez lied telling Abigail she had. Perez's statement reflects that she knew Jackie was seriously ill but she refused to seek medical care for her. Perez knew Castaneda had injured Jackie while babysitting her yet chose to do nothing about Jackie's injuries when she returned home from work. Indeed, Perez's expert opined that some of the injuries on Jackie's body were caused by Castaneda. Further, the seventy impact points on Jackie's body strongly suggest that Perez knew the extent of her daughter's injuries and not only failed to protect her but also failed to seek medical attention. Finally, Perez attempted to conceal evidence by misleading police and disposing of Jackie's body.

The evidence was also sufficient for the jury to find that Perez inflicted serious bodily injury upon Jackie by omission, that is, her failure to protect Jackie and procure medical treatment when she had a statutory and legal duty to do so. Given that we find the evidence sufficient to support the judgment of Perez as a principal, therefore, it is unnecessary to address the alternative theory as a party.

Perez's first issue is overruled.

18

**CHARGE ERROR**

In her second issue, Perez contends the trial court erred in charging the jury in four respects: first, by including "an improper law of parties charge in the jury charge;" second, by "failing to include proper application paragraphs which provide instructions as to the procedure of deliberation;" third, by including "'Allen charge' language;" and fourth, by "placing a guilty verdict form first rather than a not guilty verdict form."[7]

### *Standard of Review*

We review charge error on appeal by determining whether error occurred, and if so, whether that error caused sufficient harm to require reversal. *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.Crim.App. 2005). The degree of harm required for reversal depends on whether the defendant preserved error at trial. *Id*. at 743. If she did, the record must establish only "some harm" to obtain reversal; if she did not, the record must demonstrate "egregious harm." *Id*. at 743-44.

### *Law of Parties*

Perez first asserts the trial court "erred in instructing the jury on the law of parties." The trial court's instruction on the law of parties read:

> You are instructed that all persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible or by both.
>
> A person acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.

---

[7] In addressing Perez's second issue, we note that she never identifies for our benefit the language in the charge of which she complains. Instead, she includes verbatim reproductions in her brief of the objections to the charge she lodged at trial. From these reproductions, however, we are able to identify the portions of the charge Perez wants us to review for error.

A person is criminally responsible for an offense committed by the conduct of another if having a legal duty to prevent commission of the offense and acting with intent to promote or assist its commission, she fails to make a reasonable effort to prevent commission of the offense.

At trial, Perez asserted this instruction was erroneous for the following reason:

But to say she's responsible as a party by omission for not calling the police or not seeking help or not cooperating with officers when they arrive at the apartment was not what the party instruction said.

She has to promote the actual commission of the offense, and that is the striking of the child or she has to have a duty to prevent the commission of the offense, and then not prevented with the intent to promote or assist the commission.

In her reply brief, Perez expounds upon the assertions made by her at trial and on appeal. She contends "no legal evidentiary link allows a law of parties charge to apply in this case" and:

The State of Texas included the law of parties charge as a 'stop gap' measure to allow the jury to reach the conclusion of finding her guilty of both striking her child as well as failing to protect her child.

In essence, Perez is arguing the trial court erred in instructing the jury on the law of parties because there was no evidence to support either the submission of such an instruction or a jury verdict on that theory. We disagree.

A trial court properly instructs the jury on the law of parties "whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties." *Ladd v. State*, 3 S.W.3d 547, 564-65 (Tex.Crim.App. 1999), *cert. denied*, 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). Here, as established in our discussion of Perez's first issue, the evidence was sufficient to sustain her conviction as a party to both charged offenses. Therefore, we cannot conclude the trial court erred in instructing the jury on law of the parties. And if, as Perez contends, there was no evidence tending to show her guilt as a party, the jury would almost certainly not have relied upon the instruction on the law of parties in arriving at its

20

verdict, basing its verdict instead on the evidence tending to show her guilt as the principal actor. *See Ladd*, 3 S.W.3d at 565. Accordingly, Perez has not shown that the trial court erred in instructing the jury on the law of parties.

### *Application Paragraphs*

Perez next asserts the trial court failed "to include proper application paragraphs which provide instructions as to the procedure of deliberation[.]" We disagree.

At trial, Perez argued the sequential order of the application paragraphs violated numerous constitutional rights, including those guaranteeing her a fair trial and due process, by permitting the jury to convict her even if it had reasonable doubt. As set out in the charge, the application paragraphs followed this sequential order: (1) finding of guilt on charged offense; (2) finding of guilt on lesser-included offenses; and (3) finding of not guilty. Perez, however, takes a different position on appeal. In her original brief, Perez appears to argue the application paragraphs utterly failed to apply the law of parties to the facts in that they did not "authorize the jury to consider or not consider the evidence obtained from finding [her] guilty of one charge and not the other or both." In her reply brief, Perez appears to argue that failing to apply the law of parties to the facts of the case was harmful because "[t]he only mechanism that the jury in this case could possibly reach a capital murder verdict was based on the law of parties."

The State does not address any of the arguments raised by Perez on appeal. Instead, it addresses the argument raised by her in the trial court. The State, however, concedes, and we agree, that the charge contained an instruction on the law of parties in the abstract portion of the jury, but did not contain application paragraphs applying the law of parties to the facts of this case. By failing to apply the law of parties in the application paragraph, the trial court erred. *Vasquez v.*

21

*State*, 389 S.W.3d 361, 367-69 (Tex.Crim.App. 2012); *Plata v. State*, 926 S.W.2d 300, 304 (Tex.Crim.App. 1996), *overruled on other grounds by Malik v. State*, 953 S.W.2d 234 (Tex.Crim.App. 1997); *Campbell v. State*, 910 S.W.2d 475, 477 (Tex.Crim.App. 1995). Although Perez argues the application paragraphs are erroneous for various reasons, the errors in issue in the cases cited by Perez involve the failure to apply the law of parties in the application paragraph. Accordingly, we will construe Perez's complaint as a challenge to the trial court's charge on this basis. That said, we conclude the error is not harmful.[8]

The existence and degree of harm must be evaluated in light of the entire charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the record. *Vasquez*, 389 S.W.3d at 370 (*citing Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g)).

As for the first factor, the charge here contained the correct abstract definition of party liability as set forth in Sections 7.01, 7.02(a)(2) and 7.02(a)(3) of the Texas Penal Code. *See* TEX.PENAL CODE ANN. §§ 7.01, 7.02(a)(2)-(3). This definition was followed closely thereafter by the portions of the charge containing the application paragraphs, which expressly permitted the jury to convict Perez as a principal but not as a party.

As for the second factor, the evidence at trial was sufficient for the jury to convict Perez as a party. Although party liability was not the sole theory of criminal responsibility permitting the jury to convict Perez, there is no doubt it was the theory best supported by the evidence.

As for the third factor, both the prosecutor and defense counsel fully addressed the theory of party liability in their closing arguments. The prosecutor referred the jury to the abstract

---

[8] Because Perez failed to object to the charge on this basis at trial, reversal is appropriate only if she suffered egregious harm. *See Ngo*, 175 S.W.3d at 743-44.

definition of party liability and explained precisely how that definition applied to the evidence. Defense counsel argued that Perez was not responsible as a party because the offense had "already occurred when she found out about it." And as for the fourth factor, the application paragraphs were not fundamentally defective because they permitted the jury to convict Perez on another theory supported by the evidence, namely that she acted alone in the commission of the offenses. As mentioned above, when the trial court's charge authorizes the jury to convict on more than one theory, as it did in this case, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara*, 152 S.W.3d at 49.

In light of these factors, we fail to see how Perez was harmed by the trial court's failure to apply the law of parties in the application paragraphs. Nothing in the record suggests that the jury was confused or misled by the application paragraphs, and Perez does not contend otherwise. The jury charge correctly defined the law of parites, and it was the primary focus of the evidence. Further, it was properly argued by the parties, therefore, the jury was provided some guidance in applying that theory of the facts. Thus, in the event the jury relied on the law of parties to find Perez guilty, it is unlikely that any error in the application paragraphs would make any practical difference to a jury. *See Vazquez*, 389 S.W.3d at 372.

### *"Allen" Instruction*

Next, Perez contends—in one sentence in her brief—that the trial court erred in including an *Allen* instruction in the original charge. An *Allen* instruction informs a deadlocked jury of the consequences if it does not reach a verdict. *See Allen v. United States*, 164 U.S. 492, 501-02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896). Here, the trial court gave the following version of an *Allen* instruction to the jurors before the commencement of deliberations:

23

f. If the jury is unable to reach a verdict, it will be necessary for the Court to declare a mistrial and discharge the Jury. The case will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time. Any such future jury will be empanelled in the same way this jury has been empanelled, and will likely hear the same evidence, which has been presented to this jury. The questions to be determined by that jury will be the same as the questions confronting you and there is no hope that the next jury will find those questions any easier to decide than you have found them.

At trial, Perez argued that giving an *Alle*n instruction to the jury in the original charge was improper because the jury was not deadlocked. In her reply brief, Perez seems to suggest that the *Allen* instruction, in conjunction with the other alleged errors in the charge, coerced the jury into finding her guilty.

An *Allen* instruction is unduly coercive and therefore improper only if it pressures jurors into reaching a particular verdict or improperly conveys the trial court's opinion of the case. *See Arrevalo v. State*, 489 S.W.2d 569, 571 (Tex.Crim.App. 1973). To determine the propriety of an *Allen* instruction, the primary inquiry is its coercive effect on juror deliberation in the context and under all circumstances in which it was given. *See Howard v. State*, 941 S.W.2d 102, 123 (Tex.Crim.App. 1996), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex.Crim.App. 2014).

In this case, the *Allen* instruction was given before the commencement of jury deliberations. Although *Allen* instructions are traditionally given after the jury has commenced deliberations and reached an impasse, Perez cites no authority, and we have found none, for the proposition that a trial court errs in incorporating an *Allen*-type instruction in the body of the original charge. *See Love v. State*, 909 S.W.2d 930, 937 (Tex.App.--El Paso 1995, pet. ref'd)("[W]e find no authority condemning the issuance of the '*Allen*' type instruction in the trial court's main charge."). In fact, there is authority approving of the practice. *See Loving v. State*,

24

947 S.W.2d 615, 619-20 (Tex.App.--Austin 1997, no pet.)(concluding the trial court did not err in giving an *Allen* charge before the jury communicated it was deadlocked because giving an *Allen* charge does not require a finding that the jury is deadlocked and is less coercive in that context and under those circumstances); *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001)(noting that the preferred practice is to give an *Allen* instruction at the same time that all other jury instructions are given to avoid having the jury give disproportionate weight to a supplemental *Allen* instruction).

Further, whereas an *Allen* instruction that specifically addresses a minority of the jurors "might engender coercion," an instruction that speaks to the jury as a whole is not coercive on its face. *Howard*, 941 S.W.2d at 123-24. The instruction in question here addresses the jury as a whole and does not single out any specific juror or jurors. The instruction simply encourages the jury to reach a verdict.

Thus, considering the context of and the circumstances under which the *Allen* instruction was given, we conclude it was not impermissibly coercive in a way that undermined the integrity of the deliberation process. Perez has therefore failed to show the trial court erred in giving that instruction to the jury.

### *Order of Verdict Forms*

In her final complaint concerning the jury charge, Perez asserts the trial court erred by placing the verdict of "Guilty" first and that of "Not Guilty" last on the verdict forms. She argues the order of possible verdicts prejudicially diluted the presumption of innocence. We disagree.

There is no authority, statutory or otherwise, setting out the order of possible verdicts. A trial judge, however, is required to instruct the jury that it may return either a "guilty" or "not

25

guilty" verdict to all counts of the charged offenses and to any lesser-included offenses submitted to the jury. *Jennings v. State*, 302 S.W.3d 306, 309 (Tex.Crim.App. 2010). Although the Texas Code of Criminal Procedure does not require a trial judge to submit a written verdict form with the jury charge, a trial judge that does so must ensure that the form sets out every "guilty" or "not guilty" option that is available to the jury. *Jennings*, 302 S.W.3d 309. "The verdict form then becomes a part of the jury charge, and, as in the present case, is incorporated by reference to the main charge." *Id.* at 310. Like all charge error, errors in the verdict form are analyzed under the standards set out in *Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1984). *Jennings*, 302 S.W.3d at 310-11. As established above, in analyzing charge error, we view the charge as a whole rather than isolated statements or parts of the charge standing alone. *Washington v. State,* 930 S.W.2d 695, 698 (Tex.App.--El Paso 1996, no pet.).

The jury charge here, taken as a whole, clearly sets out the presumption of innocence accorded the defendant by law and the jury's duty to adhere to that presumption. The charge directs the jurors to follow the instructions and to accept and apply the law as stated to them. The application paragraphs instruct the jurors as to the elements of the crime charged, the lesser included offenses, and that they had to return a verdict of guilty of the crime charged, a lessor included offense, or not guilty. Especially pertinent here, the charge informed the jurors:

> All persons are presumed to be innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. . . . The law does not require a Defendant to prove her innocence or produce any evidence at all. The presumption of innocence alone is sufficient to acquit the Defendant, unless [they] are satisfied beyond a reasonable doubt of the Defendant's guilty after careful and impartial consideration of all the evidence in the case.

Likewise pertinent, the charge reiterated that it was the jurors' duty to find Perez guilty only of what the State had proven beyond a reasonable doubt and that if reasonable doubt existed as to all

26

possible verdicts, then it was their duty to find Perez not guilty.

In light of the clear instructions given to the jury, the placing of the verdict of "Not Guilty" after the "Guilty" verdict and the other responsive verdicts did not negate or dilute the presumption of innocence. Perez has thus failed to show the trial court erred in setting out the order of possible verdicts.

Perez's second issue is overruled.

## EXCLUSION OF EVIDENCE

In her third and fourth issues, Perez asserts the trial court committed reversible error in excluding evidence favorable to her. We disagree.

### *Standard of Review*

We review a trial court's decision to exclude evidence for an abuse of discretion. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex.Crim.App. 2006).

### *Evidence Material and Relevant to Defense*

In her third issue, Perez claims the trial court impermissibly prevented her "from presenting crucial evidence to the jury regarding a statutory defense provided under law" by excluding testimony from Diane Diaz Potter. Potter testified, outside the presence of the jury, that Castaneda had physically abused her while they dated. Perez sought the admission of Potter's testimony on the ground that it was material and relevant to establish the affirmative defense to a charge of injury to a child by omission set forth in Section 22.04(l)(2) of the Texas Penal Code.[9] Potter's testimony, according to Perez, corroborated her claim that she too was a

---

[9] Section 22.04(l)(2) provides that:

> (l) It is an affirmative defense to prosecution under this section:

27

victim of family violence perpetrated by Castaneda. On appeal, Perez contends the exclusion of Potter's testimony violated her constitutional right to a fair trial by depriving her "of compulsory process for a witness (though co-principal previously tried and convicted for the same offense) who is physically and mentally capable to testify to material and relevant events to the defense . . . ."

The right to compulsory process includes the right to present witnesses to establish a defense. *See Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923-24, 18 L.Ed.2d 1019 (1967); *Adanandus v. State*, 866 S.W.2d 210, 228 (Tex.Crim.App. 1993); *Hardin v. State*, 471 S.W.2d 60, 62 (Tex.Crim.App. 1971). But this right is not absolute. It is subject to reasonable restrictions to accommodate other legitimate interests in the criminal trial process, including the exclusion of irrelevant and unreliable evidence. *Roise v. State*, 7 S.W.3d 225, 239 (Tex.App.--Austin 1999, pet. ref'd), *cert. denied*, 531 U.S. 895, 121 S.Ct. 225, 148 L.Ed.2 160 (2000)(*citing United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 1264, 140 L.Ed.2d 413

---

.        .        .

(2) for a person charged with an act of omission causing to a child, elderly individual, or disabled individual a condition described by Subsection (a)(1), (2), or (3) that:

(A) there is no evidence that, on the date prior to the offense charged, the defendant was aware of an incident of injury to the child, elderly individual, or disabled individual and failed to report the incident; and

(B) the person:

(i) was a victim of family violence, as that term is defined by Section 71.004, Family Code, committed by a person who is also charged with an offense against the child, elderly individual, or disabled individual under this section or any other section of this title;

(ii) did not cause a condition described by Subsection (a)(1), (2), or (3); and

(iii) did not reasonably believe at the time of the omission that an effort to prevent the person also charged with an offense against the child, elderly individual, or disabled individual from committing the offense would have an effect . . . .

TEX. PENAL CODE ANN. § 22.04(l)(2)(West Supp. 2014).

28

(1998) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 2794-95, 125 L.Ed.2d 469 (1993)). Generally, character evidence is not admissible to show a person acted in conformity with a character trait on a particular occasion. *See* TEX.R.EVID. 404(a), (b); *Melgar v. State*, 236 S.W.3d 302, 306 (Tex.App.--Houston [1st Dist.] 2007, pet. ref'd). But an accused in a criminal case is permitted to introduce evidence of a specific good-character trait to show it is improbable she committed the charged offense when that character trait is relevant to the offense. TEX.R.EVID. 404(a)(2)(A); *Melgar*, 236 S.W.3d at 306-07.

Here, Perez was charged with injury to a child by omission, and the proffered testimony she sought to introduce related to Castaneda's violent character rather than her good character. As such, the proffered testimony does nothing more than show Castaneda's conduct in conformity with his violent character and fails to establish that, in light of Perez's character, it was unlikely she committed the charged offense. Accordingly, Perez has not demonstrated the trial court erred in excluding Potter's testimony.

Perez's third issue is overruled.

### *Mitigating Punishment Evidence*

In her fourth issue, Perez claims the trial court erred in excluding mitigating punishment evidence. Specifically, she asserts the trial court should have permitted her husband to answer the following question: "Have you made arrangements to how your daughter is going to be able to have, say, the advice of a mother if the mother is not around?" In support of her assertion, Perez directs our attention to several cases standing for the proposition that the jury should be allowed to consider all relevant mitigating evidence, especially from witnesses familiar with the defendant. *See e.g., Matson v. State*, 819 S.W.2d 839, 851 (Tex.Crim.App. 1991); *Cass v. State*, 676 S.W.2d

589, 592 (Tex.Crim.App. 1984).   But in those cases cited by Perez in which the courts held it was harmful error to exclude mitigating evidence at punishment, the excluded evidence pertained to the *defendant's* background, character, or record, or the circumstances surrounding the offense. *See, e.g.*, *Cass*, 676 S.W.2d 592 (harmful error to exclude lay testimony that defendant not a future danger).   Here, by contrast, the testimony sought to be admitted concerns the potential impact of Perez's incarceration *on her family*.   That type of evidence has been held by the Texas Court of Criminal Appeals as irrelevant because it does not directly pertain to the culpability and blameworthiness of the defendant.   *See Fuller v. State*, 827 S.W.2d 919, 935-36 (Tex.Crim.App. 1992), *cert. denied*, 509 U.S. 922, 113 S.Ct. 3035, 125 L.Ed.2d 722 (1993)(rejecting the admissibility of execution-impact evidence because it did not pertain to appellant's background, character, or record, or the circumstances of the offense).   Perez has thus failed to demonstrate the trial court erred in excluding this portion of her husband's testimony.

Perez's fourth issue is overruled.

## CONCLUSION

The trial court's judgment is affirmed.


August 19, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)