

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-24-00108-CR

---

DAVID BRANDON BOWLBY, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 30475

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

## MEMORANDUM OPINION

A Lamar County jury found David Brandon Bowlby guilty of murder. *See* TEX. PENAL CODE ANN. § 12.42, § 19.02(b)(1) (Supp.). After electing for the trial court to assess punishment, Bowlby pled true to both punishment-enhancement allegations, and the trial court assessed a sentence of life imprisonment. On appeal, Bowlby challenges the sufficiency of the evidence supporting the jury's finding of guilt. We find that legally sufficient evidence supports the jury's verdict of guilt.

As a result, we affirm the trial court's judgment.

## I. Standard of Review

"The due process guarantee of the Fourteenth Amendment requires that a conviction be supported by legally sufficient evidence." *Braughton v. State*, 569 S.W.3d 592, 607 (Tex. Crim. App. 2018). "In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*

2

*v. Virginia*, 443 U.S. 307, 318–19 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"In our review, we consider 'events occurring before, during and after the commission of the offense and may rely on actions of the defendant which show an understanding and common design to do the prohibited act.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "It is not required that each fact 'point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction.'" *Id.* (quoting *Hooper*, 214 S.W.3d at 13). "Circumstantial evidence and direct evidence are equally probative in establishing the guilt of a defendant, and guilt can be established by circumstantial evidence alone." *Id.* (citing *Ramsey v. State*, 473 S.W.3d 805, 809 (Tex. Crim. App. 2015); *Hooper*, 214 S.W.3d at 13). "Further, 'we must consider all of the evidence admitted at trial, even if that evidence was improperly admitted.'" *Id.* at 297–98 (quoting *Fowler v. State*, 517 S.W.3d 167, 176 (Tex. App.—Texarkana 2017), *rev'd in part by* 544 S.W.3d 844 (Tex. Crim. App. 2018)).

## II.     The Evidence at Trial

On March 1, 2023, Jeff Fowler, a crop manager at Daisy Farms, needed to check on an irrigation pump system on the southeast side of Lamar County on Highway 24. As Fowler was about to turn onto the gravel road, he saw a dark-colored truck driving down the hill towards him and a white truck on top of the hill. Fowler pulled onto the highway shoulder to allow the dark-colored truck to exit the property's driveway. Fowler did not see who was driving the truck because he was paying attention to the vehicles passing him on the highway. However, Fowler

3

was able to describe the truck as a large, dark-colored, four-door, four-wheel-drive truck, featuring small, wide tires with blacked-out wheels. The truck appeared to be a newer model with a clean appearance and only had window tint on the back windows. The truck turned onto the highway and then "cut[] somebody off" when the truck quickly turned toward the crossover.

Around 4:00 p.m., after Fowler tended to the irrigation pump system, he drove over to investigate the white truck still parked at the top of the hill, and, as he approached the truck, he noticed a hole in the driver's side rear window. Initially, Fowler did not see anyone in or around the truck. Fowler pulled around to the passenger side and noticed a person, later identified as Charles Peck, slumped over the center console. Fowler honked his horn a few times, but the person did not move.

Fowler called Jim Ellis, the farm's office manager, who sent Jeff Talent, the farm's general manager, to help Fowler. When Fowler looked through the back window and saw blood pooling in the floorboard, Talent called 9-1-1. Charles Landers with the Lamar County Sheriff's Office (LSCO) arrived five minutes later. Josh Crawford with the LCSO, who arrived on the scene later, testified that no cell phone, keys, wallet, or firearms were found in the subsequent search. Crawford further testified that the murder weapon—a .45 ACP—was never recovered.

Detective Robert Glen Briggle with the LCSO reviewed footage from the license-plate readers around the county for "a [four-door,] dark-colored black or blue Dodge with black wheels" where the "truck didn't have front tint on the two front doors but the back doors had tint." Briggle eventually found footage of a truck that matched the description of the truck that was near the crime scene that day: (1) at 12:25 p.m., "traveling northbound on [Highway 24],"

4

and (2) at 2:52 p.m., when Charles's truck was behind the dark-colored truck. The following day, another officer located a clearer image of the license plate of the dark-colored truck and identified the owner as Bowlby.

Law enforcement in Van Zandt County told Crawford that Bowlby could be located at the Side Street Bar in Terrell, Texas. Briggle and Crawford waited for Bowlby to leave the bar and then started talking to him. Bowlby said the following: he had previously worked on Charles's car, the last time he saw Charles was around February 28, 2023, he did not know where Paris, Texas was, and no one else drove his truck on March 1, 2023. In a later interview, Bowlby denied being in Lamar County on the day of the murder.

When Briggle and Crawford initially pulled up to the bar, Briggle saw a truck around back that matched the last number captured by the license-plate reader. It was a four door, black Dodge Ram with black tires and tint only on the back windows. Briggle searched footage from the license-plate readers beginning several weeks before the murder occurred and found a truck with a "Fast Lane Custom[z]" decal on the back glass with a cell phone number.[1] The cell phone number did not match Bowlby's cell phone number on March 1, 2023. A few days after the murder, the same truck had a Fast Lane Customz decal on the back glass with a different phone number. The second cell phone number was activated after the murder. When Briggle saw the truck at the bar, the back window glass did not have any decals or stickers on it.

---

[1]The license plate was clearer on the photo from several weeks prior. Briggle compared the license-plate number to the blurry photos from the day of the murder, and Briggle testified that the license-plate numbers matched.

Cell phone records confirmed that Charles and Bowlby communicated several times leading up to the murder. That included a phone call from Charles to Bowlby at 3:34 p.m. on the day of the murder. At the time of that phone call, Bowlby's phone pinged off a tower south of Loop 286 and Highway 24, and Charles's phone pinged off a cell phone tower on Highway 24.

Michael Peck, Charles's brother, testified that he and Charles were restoring a car with an individual in Terrell, Texas. Michael said that "Dave" met Charles and him near Charles's hangar to pick up car parts[2] and that "Dave" drove a four-door, "[b]lack or dark blue Dodge pickup truck." Michael identified Bowlby at trial as the person that picked up the car parts that day.

Michael testified that Charles had told him that he was going to buy Krugerrands[3] from "Dave," who was selling them for an elderly friend. Michael said he spoke with Charles on the phone the night before he was murdered. Michael told Charles that he had a meeting that day (February 28, 2023) and said that the meeting "went bad." He testified that Charles said he was supposed to have another meeting the next morning. Michael told Charles that he did not "feel good about this" and that it was "rotten in [Michael's] mind." Michael said Charles told him that he had good feelings about "Dave," but Charles was going to bring two firearms, a Glock and a .45.

John McCoy, a friend of Charles's, testified that, on February 28, 2023, Charles asked him if he wanted to give Charles money to buy gold. Charles said he was buying the gold that

---

[2]Crawford searched Charles's home. Crawford found a receipt from Bowlby and Fast Lanes Customz containing a phone number and date.

[3]South African gold coins.

day in Terrell, Texas. McCoy declined but cashed a $10,000.00 check for Charles. McCoy gave Charles $8,000.00 of the cashed check and put the other $2,000.00 in his safe. On March 1, 2023, McCoy asked if Charles wanted to go to breakfast, but Charles declined because his meeting was postponed until that day.

Dennis Spence, another friend of Charles's, testified that Charles approached him about buying Krugerrands below market value from a person that inherited them and wanted to dispose of them quickly. Spence did not hear from Charles for a while, and Spence said that Charles told him that there was a lot of back and forth with the seller that caused a delay. When the deal was back on, Spence decided to buy five gold coins for $7,500.00. Spence testified that, after Charles asked him for another $7,500.00, Spence gave Charles a total of $15,000.00 the morning Charles was murdered. Spence said that Charles intended to buy twenty-seven gold coins, which would require Charles to have $40,500.00. Charles left, and Spence said that "he was going to meet with this friend of his and they were going to take care of it."

Ruby Hernandez, a forensic scientist with the Texas Department of Public Safety's Crime Laboratory in Garland, issued a DNA laboratory report on July 24, 2023, concluding the "likelihood ratio indicate[d] support for the proposition that David Bowlby [was] a possible contributor to the [DNA] profile[s]" from the front passenger interior door handle, front passenger seat armrest, and passenger seat and headrest.

Dr. Amy Gruszecki, the chief forensic pathologist with American Forensics in Mesquite, Texas, concluded that the manner of death was homicide due to multiple gunshot wounds. She also testified that two of the bullets entered the top of Charles's head.

7

After hearing the evidence, the jury rendered a guilty verdict. Bowlby appeals.

## III. Applicable Law

A person commits murder if he "intentionally or knowingly causes the death of an individual." TEX. PENAL CODE ANN. § 19.02(b)(1). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a). Here, the State's indictment alleged that Bowlby "did then and there intentionally and knowingly cause the death of an individual, namely Charles Peck, by shooting Charles Peck in the head with a firearm." The jury charge added party-liability language in the application section as follows: "Bowlby, did then and there, acting alone or as a party as that term has been previously defined, intentionally and knowingly cause the death of an individual, namely Charles Peck, by shooting Charles Peck in the head with a firearm."

## IV. Legally Sufficient Evidence Supports the Jury's Findings of Guilt

Bowlby argues that there is "no evidence Appellant was criminally responsible" because, in the absence of any eyewitness testimony or physical evidence placing Bowlby at the farm during the shooting, only speculation supports the jury's finding that Bowlby was the shooter or a party. We disagree.

"When there is no direct evidence of the perpetrator's identity elicited from trial witnesses, no formalized procedure is required for the State to prove the identity of the accused." *Roberson v. State*, 16 S.W.3d 156, 167 (Tex. App.—Austin 2000, pet. ref'd). The Texas Court of Criminal Appeals has stated:

8

> It is a well recognized principle of law in this state that, to sustain a conviction, it should appear not only that an offense as charged has been committed but there should also be proof to a degree of certainty greater than a mere probability or strong suspicion tending to establish that the party charged was the person who committed it or was a participant in its commission. There must be legal and competent evidence pertinently identifying the defendant with the transaction constituting the offense charged against him.

*Phillips v. State*, 297 S.W.2d 134, 135 (Tex. Crim. App. 1957). In the absence of eyewitness testimony, "the State may prove the defendant's identity and criminal culpability by . . . circumstantial evidence, coupled with all reasonable inferences from that evidence." *Gardner v. State*, 306 S.W.3d 274, 285 (Tex. Crim. App. 2009).

The record establishes that the shooting occurred on March 1, 2023, at Daisy Farms off Highway 24 in Lamar County, Texas. Bowlby does not contest that Charles was shot and died.

Here, the evidence supports the jury's determination that Bowlby was the person who shot Charles and that he did so intentionally or knowingly. Law enforcement sufficiently narrowed the time of the murder based on the last phone call from Charles (3:34 p.m.) and the time that Fowler discovered Charles's body (around 4:00 p.m.).

The record also establishes that Bowlby's truck was in the proximity of the crime scene at the time of the murder. Although Fowler did not see Bowlby in the dark-colored truck, Fowler was able to provide a unique detail (i.e., no tint on the front windows) and a general description of the truck to sufficiently lead investigators to determine that the owner of the truck was Bowlby. The cell phones' pings, the license-plate readers, and Bowlby's DNA in Charles's truck established that Bowlby was near the crime scene around the time of the murder. *See Nisbett v. State*, 552 S.W.3d 244, 265–66 (Tex. Crim. App. 2018) ("[O]ther circumstantial

9

evidence, such as physical evidence or electronic evidence, can link a defendant to the commission of an offense." (footnote omitted) (citation omitted)). Bowlby himself stated that no one else drove his truck that day. Bowlby and Charles had been communicating for a while trying to complete a gold purchase. There were numerous phone calls and text messages leading up to the murder. Charles had told several people that he was meeting someone that day to complete the gold purchase and that Bowlby was the broker.

Moreover, the jury could have inferred guilt based on evidence of consciousness of guilt. *See Johnson v. State*, 234 S.W.3d 43, 55 (Tex. App.—El Paso 2007, no pet.) (citing *Lee v. State*, 866 S.W.2d 298, 302 (Tex. App.—Fort Worth 1993, pet. ref'd) ("Consciousness of guilt may be one of the strongest indicators of guilt."). The dark-colored truck left the crime scene and drove erratically. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex. Crim. App. 2007) (explaining that "[e]vidence of flight evinces consciousness of guilt"). Bowlby did not call for help or seek medical attention for Charles. *See Martin v. State*, 246 S.W.3d 246, 262 (Tex. App.—Houston [14th Dist.] 2007, no pet.). The jury could have reasonably inferred that Charles had a substantial amount of cash with him and that Bowlby absconded with the cash and Charles's personal property. *See Nisbett*, 552 S.W.3d at 265 ("Opportunity, when coupled with motive, is not sufficient to prove identity in a murder prosecution but is indicative of guilt."). Bowlby's truck did not have any decals on the back on the day of the murder even though the truck had decals before and after the murder. During his two interviews, Bowlby gave several untruthful or inconsistent statements. *See id. at* 266 ("[I]nconsistencies in a defendant's story can provide evidentiary support for a conviction.").

10

The evidence was also sufficient to prove the mental-state element. Gruszecki testified that the manner of Charles's death was homicide due to gunshot wounds to his head. The jury was free to determine intentionality from the following facts and inferences: (1) the firearm was discharged above the entrance wounds, (2) the trajectory of the bullets' paths through the top of the head and into the neck, (3) Bowlby was standing outside the driver's side rear window, and (4) the location of the entrance wound of both shots was close together in a fatal part of the body. *See Jones v. State*, 944 S.W.2d 642, 647 (Tex. Crim. App. 1996) ("[T]he evidence shows that the bullet struck the victim practically between the eyes and that appellant had to intentionally pull the trigger for the gun to fire."). A rational jury could find that Bowlby was aware that his actions would result in injury or was reasonably certain to result. *See Cavazos v. State*, 382 S.W.3d 377, 385 (Tex. Crim. App. 2012).

## V.    Conclusion

Viewing the totality of the evidence in the light most favorable to the jury's verdict, we conclude that legally sufficient evidence supports the jury's finding that Bowlby intentionally or knowingly caused Charles's death. We overrule Bowlby's sole point of error.

11

We affirm the trial court's judgment.[4]

                                        Jeff Rambin
                                        Justice

Date Submitted:      February 19, 2025
Date Decided:        April 25, 2025

Do Not Publish

---

[4]Bowlby also addresses the sufficiency of the evidence regarding party liability that was included in the jury charge. Since the record reflects sufficient evidence that the jury could convict Bowlby as the direct cause of Charles's death, we do not address whether sufficient evidence was presented to convict Bowlby as a party. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004) ("[W]hen the trial court's charge authorizes the jury to convict on more than one theory, . . . the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories.").